Harold A. Miller, Ellis Furry and Donald E. Engel, Plaintiffs-Appellees-Appellants, v. Lyle V. DeWitt and Russell M. Amdal, d/b/a DeWitt-Amdal & Associates, Defendants-Third Party Plaintiffs-Appellants, and Maroa Community Unit School District No. 2, Defendant-Appellee.

Lyle V. DeWitt and Russell, M. Amdal, d/b/a DeWitt-Amdal & Associates, Defendants-Third Party Plaintiffs-Appellants, v. Fisher-Stoune, Inc., Third Party Defendant-Appellee.

**Gen. No. 10,546.**

Fourth District.

April 26, 1965.

Rehearing denied July 1, 1965.

44

46

Giffin, Winning, Lindner & Newkirk, of Springfield, for appellants.

Grenias & Owen, LeForgee, Samuels, Miller, Schroeder & Jackson, all of Decatur (Carl R. Miller, Jerald E. Jackson and Robert W. Ohlsen, of counsel), Earl S. Hodges, of Springfield, for appellees.

PER CURIAM.

This action was brought by three employees, Harold A. Miller, Ellis Furry, and Donald E. Engel, of a contractor, Fisher-Stoune, Inc., against the architects, Lyle V. DeWitt and Russell M. Amdal, d/b/a DeWitt-Amdal & Associates, and against the owner, Maroa

Community Unit School District No. 2, for injuries sustained as the result of the collapse of a roof of a school gymnasium building during remodeling operations by the contractor. The jury returned verdicts in favor of the plaintiff Miller for $30,000, Furry for $90,000, and Engel for $5,000, against the defendants architects under both the negligence and Structural Work Act counts, upon which the court entered judgments, and from which this appeal is taken by the defendants architects, Lyle V. DeWitt and Russell M. Amdal. The jury returned a verdict for the defendant School District and against the plaintiffs, upon which a judgment was entered, and the plaintiffs cross appeal from that. Also, the court, on motion, before trial, dismissed a third-party complaint filed by the defendants architects against the contractor, Fisher-Stoune, Inc., and entered a judgment in bar of that action, and from that judgment this appeal is likewise taken by the defendants architects. The defendants architects' motions for directed verdicts, and to withdraw the charges of negligence in Counts I, II, and III, at the close of the plaintiffs' evidence and all of the evidence had been denied, and the defendant School District's motions for directed verdict had been denied. And the defendants' architects' post trial motion was denied as well as the plaintiffs' post trial motion.

The plaintiffs' actions were predicated on charges against the defendants architects of negligence and of violation of the Structural Work Act, and against the defendant School District of violation of the Structural Work Act. The complaint was in six Counts, Counts I, II, and III by each respective plaintiff, Miller, Furry, and Engel, against only the defendants architects, DeWitt-Amdal, and Counts IV, V, and VI by each respective plaintiff against the defendant School District and the defendants architects. Count I

alleged, in substance, that the transaction occurred in Maroa on May 3, 1960; the defendant School District had begun extensive remodeling of the gymnasium attached to the high school; the defendant School District had contracted with and retained the defendants architects to do the necessary architectural work and to supervise the construction; the defendant School District had contracted with Fisher-Stoune, Inc., general contractors, to do the work involved in remodeling under the direction and supervision of the defendants architects; the plaintiffs were employed by Fisher-Stoune, Inc., and were engaged in removing certain structural steel members supporting the roof; Fisher-Stoune, Inc., under the direction and supervision of the defendants architects had undertaken to support the roof by tubular steel scaffolding; while the plaintiffs were engaged in removing certain supporting beams the tubular steel scaffolding gave way and collapsed under the weight of the roof, causing a portion on which the plaintiffs were working to fall; as a direct and proximate result of the collapse the plaintiffs received personal injuries; the collapse of the roof and the plaintiffs' injuries were the direct and proximate result of one or more of the following negligent acts or omissions of the defendants architects:

 (a) Negligently and carelessly failed to provide for adequate support for the roof of said gymnasium prior to having the structural supports therefor removed;
 (b) Negligently and carelessly failed to calculate a sufficient safety factor to be used in the scaffolding under said roof;
 (c) Negligently and carelessly failed to oversee and inspect the scaffolding as used to determine whether or not it was safe to use;

51

(d) Otherwise negligently and carelessly failed to apply to the work aforesaid the degree of skill which would customarily be brought to such work by competent architects in and about this community;

the plaintiffs were in the exercise of due care for their own safety; in the collapse the plaintiff Miller received serious permanent injuries. Counts II and III were similar. Count IV alleged, in substance, in addition to realleging parts of Count I, that the defendants each violated c 48, Ill Rev Stats 1959, § 60, which was a direct and proximate cause of the collapse of the roof and the injuries occasioned; and by c 48, Ill Rev Stats 1959, § 69, a cause of action has accrued to the plaintiffs for damages. Counts V and VI were similar.

The answer of the defendants architects, in substance, admitted that the defendant School District had contracted with and retained them to do the necessary architectural work on the remodeling and to provide architectural supervision during the construction, the defendant School District had contracted with Fisher-Stoune, Inc., to do the work involved in the remodeling under the architectural direction and supervision of the architects, Fisher-Stoune, Inc., had undertaken to support the roof by tubular steel scaffolding, while the plaintiffs were removing certain supporting beams the roof collapsed, and as the direct and proximate result of such collapse the plaintiffs sustained personal injuries, and denied all the other allegations, including the applicability or violation of the Structural Work Act.

The answer of the defendant School District to Counts IV, V, and VI, in substance, admits certain allegations, including that Fisher-Stoune, Inc., had undertaken to support the roof by tubular steel construction, and while the plaintiffs were removing cer-

52

tain supporting beams the roof collapsed, and denies the remaining allegations, and says that it is not an owner, contractor, or other person or firm as contemplated by the Structural Work Act and no liability attaches to it by virtue thereof or at common law.

The amended third-party complaint by the defendants architects against Fisher-Stoune, Inc., made the plaintiffs' complaint and their answer thereto parts thereof, and, in substance, alleged that as architects, their responsibility consisted of drafting plans and specifications and such supervision of the actual construction as would assure that the contractor complied with the plans and specifications, but they had no right or duty to direct or in any manner control the method or means by which the contractor accomplished the results called for by the plans and specifications; Fisher-Stoune, Inc., had sole responsibility for the means and method of accomplishing the results called for by the plans and specifications; the designing, construction and placing of the temporary supports and the manner and method of removal of the permanent supports were solely under the control of Fisher-Stoune, Inc., and not the architect; these temporary supports did not come within the purview of the Structural Work Act, nor did the Act apply to the third-party plaintiff; if any liability is imposed on the third-party plaintiffs under Counts I, II, and III of the complaint their negligence, if any, is passive, the active negligence being solely that of Fisher-Stoune, Inc.; if any liability is imposed on the third-party plaintiffs by Counts IV, V, and VI of the complaint, it is a liability imposed by law without fault on their part, the person having actual charge of the work being Fisher-Stoune, Inc.; if there is any liability imposed on the third-party plaintiffs they have a cause of action over against Fisher-Stoune, Inc., for indemnity; they were in the exercise of due care;

Fisher-Stoune, Inc., was negligent in certain respects, which proximately caused the injuries and damages set forth in the complaint; and as a direct and proximate result of such neligence the roof collapsed, thereby proximately causing the plaintiffs' injuries.

The motion of Fisher-Stoune, Inc., to dismiss the amended third-party complaint urges, as grounds, in substance, that it does not state a cause of action; the original complaint charges the defendants architects with primary active negligence and one so charged is not entitled to indemnity from another alleged tort-feasor; the Structural Work Act is inapplicable, there is no derivative liability, if the defendants architects and Fisher-Stoune, Inc., were co-tort-feasors section 25 of the Civil Practice Act precludes a third-party action for contribution among alleged tort-feasors; certain portions are conclusions; a certain part contains more than one allegation; it is an attempt to do indirectly what cannot be done directly, in that if it is not dismissed the plaintiffs employees will be given an opportunity to seek damages from their employer, Fisher-Stoune, Inc., which exceed their workmen's compensation benefits; if the defendants architects were actively negligent they are not entitled to contribution from an alleged co-tort-feasor, and if they were passively negligent or not negligent at all they are not liable to the plaintiffs and have no cause of action for indemnity.

Some time prior to April 14, 1959, Maroa Community Unit School District No. 2, which is governed by a board, decided to remodel and enlarge the gymnasium at the high school and contracted with Lyle V. DeWitt and Russell M. Amdal, d/b/a DeWitt-Amdal & Associates, architects, for architectural services in connection therewith, that contract being prepared by the architects. Pursuant thereto, DeWitt's organization prepared the necessary plans, specifications and pro-

54

posed building contracts, and after the same were approved by the School District, caused bids to be received which resulted in the letting of three contracts by the School District: one to Fisher-Stoune, Inc., for the general construction work; one to Burdick Plumbing Co. for the plumbing and heating; and one to Heise Electrical Co. for the electrical work. The work proceeded under the three contracts while the school remained in session.

The plans for the remodeling called for the removal of the west wall of the gymnasium; the removal of a north-south proscenium truss from that point (the old west wall) to the new west wall of the new gymnasium; the removal of two steel columns in the old west wall, which, together with the proscenium truss, originally supported the west ends of four east-west roof trusses; the substitution where the old west wall and proscenium truss were of a new north-south main-bearing truss into which would be fastened the west ends of the old roof trusses and the east ends of the trusses in the new structure. The defendants architects say that the plans showed the reaction (weight or load bearing) at each end of the new north-south main-bearing truss, which would be the total weight to be supported by that new truss upon completion of the new and remodelled building. This weight was the total weight of the new roof and the old roof, including both the dead load (weight of the structure itself) and the live load (snow, gymnasium equipment attached to the roof, impact from the use of such equipment, etc.). There was evidence that the weight of the new roof could be computed from the information shown on the plans. There was some evidence the weight of the old roof could be obtained therefrom too, by a series of computations, but there was some evidence such could not be ascertained therefrom. In any event, the plans did not specifically indicate the

55

weight of the old roof and east-west trusses which was to be temporarily supported by temporary scaffolding after the north-south proscenium truss was removed and pending installation of the new north-south main bearing truss. Nor was the composition of the old roof given on the plans. The plans did contain certain drawings that the roof, or a part thereof (meaning, the defendants architects said, a new or fill-in portion of roof) was lightweight aggregate concrete.

In April 1960, Byron Beals, superintendent for the contractor Fisher-Stoune, Inc., after examining the plans and after making personal observation of the structure, before any part of the west edge of the old roof had been cut away, determined to shore up the west ends of the four east-west trusses during the transition by means of four columns or towers of tubular steel scaffolding, each column being seven feet by five feet, and each composed of four legs, manufactured by Universal Manufacturing Corporation, placed generally and approximately under the west ends of each of the four east-west trusses, plumbed and snugged up against the trusses with timbers composed of 2 x 10's laid on top of the legs of the towers on which the trusses directly temporarily rested. This system was followed, with each of the columns of shoring being identical, and generally similarly placed. The seven foot side or dimension of each column or tower faced west, extending north-south. The five foot side or dimension extended west-east. Apparently the west edge of each column or tower was set in about 4 feet east of the west end of each truss, and if so (the column or tower being 5 feet wide west-east) the center of the weight bearing load as to each truss on the column or tower thereunder would be 6½ feet east of the west end of each truss. The record is not clear, however, as to the precise location of each column or tower or as to the precise center of the weight bearing

56

load as to each truss with respect to the west end of each truss or as to whether all the columns or towers were set in exactly the same distance east of the west end of each truss. The 2 x 10's were not connected together between the columns of shoring. The columns were tied together only by a nailing strip to hold up a canvas tarpaulin, and a 2 x 4 strip covered with plywood and covering approximately the lower four feet on the outside to keep basketballs, etc., from rolling underneath. The gymnasium was used up until the day before the collapse. Mr. Nichol, acting superintendent of the defendant School District had some conversation with Mr. Abbott, of the defendants architects office, and Mr. Beals relative to the location of the shoring—to the effect it was to be placed so as to least interfere with use of the gymnasium. In arriving at the type of temporary structural supports Mr. Beals did not take much into consideration whether the old roof was lightweight or regular concrete. He assumed it was a normal roof. He had a set of plans with him. He used more his own observation of the material. He could not see the concrete. He said the drawing indicated the existing roof was lightweight concrete. During his observations, at the time of location of the shoring, Mr. Abbott (of the architect's office) was there.

On the morning of May 3, 1960, an ironworker crew, which included the three plaintiffs, and Paul Shaffer, and their foreman, Nate Vandervoort, all employed by Fisher-Stoune, Inc., came to the scene and commenced the removal of the north-south proscenium truss and the two steel columns at the west end of the old gymnasium, the west brick wall (which was not a bearing wall, apparently) having theretofore been removed. They first erected two new steel columns at the west end of the new gymnasium, then disconnected the two center east-west roof trusses from the proscenium

truss, and disconnected the proscenium truss from the two original steel columns, and moved it to its new location. It was stipulated that when the two center east-west roof trusses were disconnected from the proscenium truss, all of that part of the roof load which had theretofore been supported by the west end of such two center east-west trusses and the proscenium truss was transferred respectively to the shores or columns or towers thereunder. This occurred at approximately 11:00 a. m.

At about 1:00 p. m., operations were commenced to remove the north steel column. In order to do this, a crane was placed in the area of the new building, with a boom extending over in the vicinity of that column. A ⅝ths inch, or ¾ths inch steel cable with a loop or eye at each end, called a choker, was then wound around the column above the center, and with one loop threaded through the other and then hooked to the hook of the boom. At that time, a "strain" was taken on the cable by the crane operator sufficient to take up the slack and take the kinks out of the choker, for the purpose of holding the column from falling down when it was disconnected. The heads of the bolts connecting the north east-west roof truss to the north column were then cut off; and while the plaintiff Miller, with an acetylene torch, was cutting off the base of the column, one of the other plaintiffs was out on the truss, knocking the bolts out. When the last bolt was knocked out, the crane took that north column away, and the plaintiffs moved over preparatory to repeating the process on the south column.

It was stipulated that upon the removal of that north column, that part of the roof theretofore supported by the west end of the north east-west truss was transferred to the shore thereunder. The time was then approximately 2:00 p. m.

58

There was some dispute in the evidence as to whether or not a second and additional strain was taken on the choker after that north column was cut through at the base and before the last bolt was removed from the top.

The method of proposed removal of the south column was similar. The crane was moved to the south and the boom extended over to the vicinity of that column, at an angle. The choker was then attached to the column at a point which was variously testified to as being some five to eleven feet from the top. A "strain" was then taken on it sufficient to take up the slack and take out the kinks in the five-eighths inch steel cable. Plaintiff Miller proceeded to cut off the base of the column and then stepped back to the east against the tarpaulin to see if he could see daylight underneath and thus determine that it was cut clear through. Again there is some dispute in the evidence as to whether or not a second additional strain was taken at that time. While Miller was cutting the column off at the bottom, plaintiff Furry was out on the south east-west truss, knocking the bolts out at the top where the west end of that truss was fastened into the south column. Plaintiff Engel was standing on the roof, watching. At the approximate time that Furry knocked out the last bolt, the roof collapsed. The force of the air and the movement of the tarpaulin knocked Miller out into the new part of the building and entangled him in the tarpaulin. Engel rode the roof down. Furry was caught under some of the steel purlins and pinned therein, necessitating cutting the steel loose with an acetylene torch while buckets of water were poured on his leg to keep it from getting burned. The collapse took place at approximately 3:00 p. m. Several pictures of the scene after the collapse are in evidence.

59

Each of the plaintiffs, the crane operator, and the other ironworker testified that there was no movement of the south column before the collapse of the roof. The plaintiff's witness Kenneth Sexton testified that after Furry knocked the last bolt out, "the column on the south end swung out" and that the "support there began to collapse and come on down and then as it went down, it drug everything else with it." From the time the column swung until the collapse was "in seconds," he said.

The tubular steel scaffolding used for shoring was neither designed for, nor did any worker, including the plaintiffs, ever use it upon which to climb or stand, or place and hold tools or materials being incorporated into the building. It was designed and used solely to shore the east-west trusses.

The literature of the manufacturer of the tubular steel shoring, with the load (on each column or tower) equally distributed to the four legs thereof, as was here involved, said the allowable maximum shoring load was 5,000 pounds per leg (20,000 pounds per column or tower).

The Shoring Handbook of Universal Manufacturing Corporation, the manufacturer of the shoring, plaintiffs' Exhibit No. 45, states under the heading "Engineering" and "Loading of Shoring Panels," in part, that:

> "This section contains information on loading and spacing of scaffolding used for shoring. The data is based on Universal's experience in the field and was confirmed in laboratory tests conducted under independent supervision.
>
> Also included are tables of engineering data that will be helpful in planning efficient, safe, shoring layouts.

60

Specifically, the tables contain information on the weights of various types of concrete construction, and on allowable timber loads. The next step is the selection and spacing of scaffold panels into towers so as not to exceed recommended loading limits. . . ."

"COLUMN LOADING (Fig. 1)

When using this method, the allowable shoring load per column is 5,000 pounds.

. . . . . .

To insure absolute safety and determine safe load limits, extensive tests were conducted under Pittsburgh Testing Laboratories' supervision on all major makes of scaffold. Equivalent scaffold towers were erected, loaded in all three ways, and tested till they failed. As a result of these tests, Universal's Engineering Department concluded that no standard type scaffold could safely be loaded beyond 5,000 pounds per scaffold panel leg.

. . . . . .

Adequate safety factors are included in the column and girt loading figures in the Engineering Tables in this Shoring Handbook, and this loading data is applicable to all Universal Ezebilt panels.

Recommended loading and capacity data must not be exceeded. . . ."

The defendant DeWitt, testifying under section 60 of the Civil Practice Act (which testimony was later adopted by the defendants architects) said, in substance, so far as necessary to be set forth, that: He is an architectural engineer. The profession of architect

overlaps with architectural engineer. There could be some overlap with some functions of a structural engineer in the design of supporting structures of buildings. One of the architect's duties is to see that the material being incorporated into a building is in accord with the specifications, but not necessarily the way it is being so incorporated. He gave as an illustration that if an 8″ column of a certain weight and dimension was supposed to be put in and a 6″ column of lesser weight was being put in he would see that the 8″ column was put in. Before May 3, 1960, he and his office had not made calculations to determine whether the scaffolding used as shoring was strong enough to support the roof truss and roof. They have made such calculations since. In his opinion the shoring was strong enough to support the load. They had calculated the overall weight of the gymnasium roof before the collapse, during the design stage when they were preparing the drawings. They had obtained the original drawings of a Mr. Harris, the original architect when the building was originally constructed, and the shop drawings of Mississippi Valley Structural Steel Co. used in fabricating the steel in the original building. He and his office then designed the structural support for the new addition. From that they calculated the total weight of the roof. The roofing material was tar and gravel, 6 pounds per square foot, the structural deck was 2½ inches thick, about 32 pounds, cork about one inch thick, about 2 pounds, purlins, 2.24 pounds, trusses, 2.35 pounds (figuring the weight of the truss at 1,800 pounds and using a certain formula)—making a theoretical total weight of 43½ (44.59 it would seem) pounds per square foot, and the old gymnasium roof being 80′ x 48′ or 3840 square feet that makes a total dead load of the roof itself of 167,040 (171,225 it would seem) pounds. Live load would include and add snow, ice, or something

of that character (gymnasium equipment attached to the roof, impact from the use of such, etc.). Each (east-west) roof truss carried a roof area 16' wide and 48' long. The shoring should have been adequate, he said to carry the weight. One tenth ($\frac{1}{10}$th) of the entire roof was supported on each shoring. The weight on each shoring was 16,700 pounds (17,122 it would seem). (Evidently that was on the assumption the bearing point of the truss on the shore was at the extreme west end of the truss.) No cross bracing of the shoring towers was assumed. From the tables in the brochure of the manufacturer of the shoring, plaintiffs' Exhibit No. 45, he arrived at the opinion each leg would carry 5,000 pounds, but there is no table therein exactly like the situation here. The 167,000 pounds total should be reduced because the proscenium arch (or truss) was out, and the concrete roof had been cut back— though he did not know exactly how many feet. He made no calculation of any safety factor in the shoring, but said there is a built-in safety factor. If the bearing point of the east-west truss on the shore were 6½ feet east of the west end of the truss (which is apparently more in keeping with the record) that would make a difference in the load—it would then be 19,200 pounds, about, (instead of 16,700 pounds) on each shoring. He bases his assumption the roof was 2½" thick on measurements made on the job, samples broken off, and the original Harris plans which so indicated. A difference in thickness of that concrete of ¼" would mean about 3 pounds (per square foot). The plans do not show the weight of the concrete. When he determined the weight of the east-west trusses (figuring them at 1,800 pounds and using the formula concerned), he had not noticed the actual work list on the Mississippi Valley drawings which indicate each truss to be 3,458 pounds, and using that the dead weight loading of each truss per square foot was 4.5

63

pounds (instead of 2.35 pounds as he'd first calculated). He had never made a personal inspection of the upper end of the shoring. He could not state whether any bracing was done at the truss. The purlins and concrete roof could be considered temporary lateral bracing. No other bracing was necessary pending installation of the new north-south main bearing truss. His calculations show the timbering spiked together at the top of each tower was adequate. In their plans they show a cross section of the new roof section, indicating light weight concrete—new work. Their specifications indicate lightweight concrete roof fill. This was for the fill-in of the part of the old roof which was cut out. It did not mean the type of concrete already in the old roof. He was in and about the job about 3 or 4 times from April 1 when the shoring was erected until the collapse May 3. Mr. Abbott of his office was more directly responsible for architectural supervision. If a shore is appreciably overloaded so it is going to fail it will fail suddenly when overloaded. The plans and specifications sufficiently show the load to be transmitted from the trusses to the shoring. The reaction of the (east-west) trusses in the old roof is in the plans—in the theoretical loading of what Truss B (the new north-south main bearing truss) would carry. All the information necessary for the contractor to so determine is given. The weight of the old roof can be determined by a series of deductions, he said. He did not compute the load the shoring would actually carry before the collapse because it was not his duty to design shoring for a contractor. The manner of supporting an existing structure is the contractor's business. There was no clerk-of-the-works here. The architect, he said has no supervision over the techniques or methods of construction or manner in which the contractor carries on his contract other than as to the end result—the

finished product—a completed building, architecturally pleasing, constructively sound, and functionally useful.

Dean Wurth, a structural engineer, was a witness for the plaintiffs, and in substance said this: There is considerable overlap between architects and structural engineers, though in some fields they do not overlap. He had studied the positioning of the shoring here, made computations, and reviewed the Mississippi Valley plans. Plaintiffs' Exhibit No. 47, being a piece of concrete from the old roof is about $2\frac{3}{4}$ inches thick. Defendants' Exhibit No. 1, being also a piece of concrete from that roof, is about $2\frac{1}{4}$ inches thick. Assuming the roof to be $2\frac{3}{4}$ inches, the concrete weighed 34.3 pounds per square foot—assuming 6 pounds per square foot for roofing, 2 pounds for cork insulation, 2.2 pounds for steel purlins, 4.4 pounds for a truss (being 3458 pounds per truss as indicated in the Mississippi Valley drawings)—the total of the roof area would be 48.9 pounds per square foot—18,800 pounds, about, dead weight to be carried by each shore ($\frac{1}{10}$th of about 187,776 pounds, being 48.9 x 3840 square feet)—the end reaction at the extreme west end of the truss— $\frac{1}{2}$ of the total of 37,600 pounds carried by each truss. If the center of the weight bearing load were $6\frac{1}{2}$ feet east of the west end of the truss the load is increased and the total weight on each shore then would be about 23,700 pounds, dead weight. A strip of concrete slab of roof 3′ wide and 16′ long would weigh about 2,000 pounds (a part of the old roof had been removed during the operation). If that were subtracted from 23,700 pounds there would be 21,700 pounds on each shore. Each foot the scaffold is moved east toward the center of the truss increases the load 2%—65% of the total load (if the center of the weight bearing load were $7\frac{1}{2}$ feet east of the west end of the truss) would be 24,500 pounds and reducing that by 2,000

65

pounds (for the removal of some of the old roof) would leave 22,500 pounds dead load on the center of the shoring under those circumstances. The standard of practice of architects and engineers is the same as to design or specifications for changes in existing structural steel in existing buildings and remodelling. In his opinion, the load or weight to be shored where structural members of substantial size are to be removed should be given on the drawings. No bracing of the four east-west roof trusses would not be careful bracing. The concrete roof deck is partial bracing—for the top but not bottom part of the truss—as would be the purlins, they made some lateral support at the top. On the basis of $2\frac{1}{4}$ inches of concrete roof instead of $2\frac{3}{4}$ inches the total weight per shore would be 19,100 pounds (if the center of the weight bearing load were $6\frac{1}{2}$ feet east of the west end of the truss). The plans here did not tell what the existing roof construction was. From the plans he cannot figure the dead load of the old roof.

The defendants architects' witness Henry Fernandes, a Springfield architect, said, in substance, that from the plans and specifications here involved he can determine the total reaction of the west end of the (east-west) trusses of the old gymnasium—it would be necessary to make some computations but it can be done. "Lightweight concrete" on the plans refers to new work. The function of an architect in designing and supervising construction is to provide the owner a building to serve his purpose, to see that it as finally accepted meets the purposes. The methods and means in arriving at that is the contractor's responsibility. He had no information from the manufacturer but in his opinion the type of scaffolding here concerned could reasonably be assumed to carry twice the load as a safety factor. He thought it would be safe to assume you could go higher than

5,000 pounds per leg and not be negligent—a reasonable amount of overload would not be hazardous—something like 1,000–2,000 pounds, But he would follow the manufacturer's prescription of any further loading when they are that clear. From the figures in the plans you would go back and find the total reaction of each truss on the new truss. The material of the existing roof is not shown. You arrive at these by figuring backwards, figuring from the new. The total carrying capacity of the new north-south main bearing truss was 256,000 pounds. Making certain assumptions and going through the arithmetic a certain way there is a reaction on each old east-west truss of about 24,700 pounds, and he thought the truss weight itself would probably be 3,000–4,000 pounds more, at least. We would not know the weight of the existing roof to be exact, from the computation. We would know that, based on the capacity of the new (north-south main bearing) truss, what the architect had computed to be on the old (north-south proscenium) truss. He thought one familiar with construction work could figure out what the loads were on the existing trusses. Some plans show the load of a given truss at a given point. Some do not. In new work, loads are shown. In remodelling or shoring it is very unlikely to find anything in the plans or specifications on that.

The defendants architects' witness John F. Sweetnam, a Decatur architect and structural engineer, said that the architect's responsibility lies in end results—giving the owner a completed building conforming to the plans and specifications. It does not include the means, progress, or procedures employed by the contractor in completing the construction. He had examined the plans here concerned. He said by theoretical determination and analysis thereof the load on the ends of the four (east-west) trusses fastened

67

in the proscenium arch can be determined. It is not customary in the vicinity for an architect to show on plans and specifications, in figures, the load a contractor needs to shore up in connection with construction. Making his computations from the plans and shop drawings, considering the (east-west) trusses, the purlins, the roof, with concrete at $2\frac{1}{2}$ inches thick (the plans do not show the thickness, he said), the dead load at the extreme end of each truss would be 17,900 pounds, and 18,600 pounds is the weight transmitted to each shore if the center of the shore is $6\frac{1}{2}'$ (east) of the west end of the truss and if $3'$ of the roof is removed. A shore adequate to carry 18,600 pounds would be satisfactory shoring. As to the attachment of the choker from the crane on the (north or south) columns under the circumstances indicated, with some eccentricity, the tendency would be for the top of the column to swing out from and the bottom to swing in toward the building. After the west end of each east-west center truss was disconnected from the proscenium arch the entire load of the area supported by that truss is transferred to the shore thereunder—$\frac{1}{10}$th of the roof load. Here the proscenium (north-south) truss was to be removed and reused, and the (east-west) trusses were to be reconnected to the new (north-south main bearing) truss. The roof was to be part new and part that of the existing structure. The contractor is responsible for the building during construction. The work manner, or means of construction, or procedure used are solely the prerogative of the contractor. The type of shoring here was up to the decision of the contractor. The minute an architect goes in and assumes responsibility, he becomes liable.

The blue prints for the remodelling of the defendants architects, plaintiffs' Exhibit No. 1, contain, inter alia, these references or recitals: first floor plans,

drawing No. 6: "remove all existing structure of stage and west walls"; wall sections, drawing No. 9: "Section B—Lt. wt. conc.—blt. up roof—Section C—insulrock"; building sections and roof details, drawing No. 10: "Detail A–2" insulrock—lt. wt. conc."; roof framing plan, drawing S–4: "existing trusses to remain—rework end conditions (the west-east trusses) —line of existing purlins—new 8 x 10 purlins to bear on existing trusses—truss B (the new north-south truss)—truss A, A–1, A–1, A (the new west-east trusses in the new part)"; trusses and misc.: steel details, drawing S7: "reworking of west end of existing truss framing into truss—truss B (the new north-south truss)." The original drawings of Mr. Harris for the original building, plaintiffs' Exhibit No. 2, contain, inter alia, these references or recitals: sheet 7: "Truss A–4 like this (the west-east trusses) —Truss B–1 like this (the original north-south proscenium truss)"; sheet 12, roof framing plan: "Truss B (the original north-south proscenium truss)—truss A (the four west-east trusses)." The drawings of Mississippi Valley Structural Steel Co. for the steel in the original building, plaintiffs' Exhibit No. 3, contain, inter alia, these references or recitals: sheet E4, 2nd floor and roof plans: "Truss 12B1 (the original north-south proscenium truss)—truss 6B1, 6B2, 6B2, 6B1 (the four west-east trusses)"; sheet 5: "roof trusses)"; sheet 6: "roof trusses—make 2 trusses, mark 6B1—make 2 trusses, mark 6B2—(the west-east trusses)—weight 13,832 pounds—(which would be 3,-458 pounds for each of the 4 west-east trusses)—make 1 truss—mark 12B1 (the original north-south proscenium truss—the weight of which we cannot find thereon)." The drawings of Mississippi Valley Structural Steel Co. for the new north-south main bearing truss, plaintiffs' Exhibit No. 50, contains this recital or reference: "one truss—A7—weight 19,614 pounds."

69

During the direct examination of plaintiffs' witness Ronald W. Shafer, a teacher, although his testimony was expressly limited to the defendant School District, plaintiffs' counsel asked him if he had had a conversation in the gymnasium before the collapse, with a Mr. Boyd, football coach and assistant principal of the school, concerning the safety of the shoring that had been erected. When objection was made to his question by the defendant School District, which was sustained, plaintiffs' counsel said:

> "If the Court Please, this is not intended to be probative in any fashion as to the sufficiency of the shoring but to show notice on the part of the owners who should have been doing something about it."

The defendant School District again objected, the defendants architects did not specifically object but asked that a mistrial be declared, and the objection was again sustained. Later, after some discussion outside the presence of the jury, a motion to strike all the witness' testimony was granted, and the jury instructed to disregard the same. The court denied the defendants architects' motion for mistrial made upon the grounds that the alleged prejudicial character thereof and of counsel's statement could not be erased from the minds of the jury.

During the cross-examination of the defendant Lyle DeWitt, after the witness had testified that he would have had no right to interfere with the contractor's manner of shoring up the trusses, plaintiffs' counsel asked if he would not have interfered anyway and stopped the work if he saw the contractor attempting to shore up a steel truss weighing many tons with a 2 x 4 standing on end. We find in the abstract no objection by the defendants architects to that line of questioning. The plaintiffs' counsel followed this up

in his closing argument to the jury, the defendants architects say, but we find in the abstract very little reference thereto in the argument to the jury.

By the questioning of certain witnesses and by parts of the final argument, the defendants architects say that the counsel for the plaintiffs developed that there was no other place for plaintiffs to work but on the roof, the trusses and the floor, and that therefore, the thing which held up the roof, namely the shore, was a scaffold. This, the defendants architects urge, was an entirely different theory of recovery than that stated in the complaint, although plaintiffs' counsel denied that he had changed his theory.

Neither Thomas Bull, an employee of DeWitt who actually prepared the plans for DeWitt, nor Mr. Abbott, another employee of DeWitt, who more frequently visited the site, were called as witnesses by either side. The defendants architects say that Abbott was not present at the time of the collapse, and there was no evidence he had any knowledge of the sufficiency or insufficiency of the shores. No effort was made by plaintiffs' counsel to subpoena either, nor was any request made upon the defendants to produce them. In his capacity as the person actually supervising for the defendant DeWitt, the defendants architects say Abbott could have been called by the plaintiffs under section 60 of the Civil Practice Act, but was not. In the final argument, plaintiffs' counsel referred to the fact that they were not produced as witnesses by the defendants, and argued that unfavorable inferences should be drawn therefrom—to some of which references the defendants architects objected—but on several occasions they did not object.

The plaintiff Harold A. Miller was knocked from the level where he was working into a sub-basement some ten feet below, injuring his back and left leg. He was cared for by Dr. Terrell and Dr. Sterling

71

G. Parker. Dr. Parker is an orthopedic surgeon. He had X rays made of the entire back and pelvis which were negative for fracture. The left foot and ankle were X-rayed and showed a comminuted fracture of the left os calcis—heel. The os calcis was impacted, that is, it was broken in several fragments and impacted together. He was disabled from work until January 19, 1961. He then returned to work at an increase in pay and has worked steadily since. He has a permanent disability of the left foot with approximately one half of the side motion of the left foot compared to the right; some thickening of the os calcis under the heel joint; and some residual deformity. He was unable at the time of trial to do any of the climbing jobs necessary in the structural steel trade and was still having constant pains through the foot and ankle when at work on construction jobs. His total medical expense was approximately $650 and his loss of income was approximately $5,000.

The plaintiff Ellis Furry was injured when he was trapped in the steel truss on which he was working when it collapsed. His right leg was caught under the truss and twisted and crushed. It was necessary to use an acetylene torch to cut the steel away, and buckets of water were used to keep him from burning as much as possible. It was necessary to use the torch within eight or ten inches of his leg and it was blistered by the heat even with all the water that was used. He was conscious and kept saying the men were burning him up. Most of the clothing was gone from his body and there were abrasions on all of his body, head, face and shoulders. The bone was protruding through the skin of the right leg and according to Dr. Terrell, who assisted him while he was being cut loose from the steel truss, he was in so much pain it was hard to tell if he was conscious or unconscious. He had multiple fractures of both bones

of the right leg; a rupture of one of the muscles of the right leg in the thigh; an injury to the left shoulder blade; fractures of the rib cage, consisting of fractures of the third, fourth, fifth, sixth, seventh and eighth ribs on the right and eleventh and twelfth on the left; and fractures of the second lumbar vertebrae and the transverse process of the first lumbar vertebrae. He was treated with a body cast from the arm pits to pelvis and a right leg cast. His right leg was operated on and a steel plate six or seven inches long with seven screws was used to hold the leg in place. This plate is permanent. He ended up with limitations of motion in the back in all directions; limitations in the movement of the right leg and ankle; bone bridging of several of the vertebrae and a crepitus in the knee. He returned to work about October 31, 1960, at an increase in pay and has worked steadily since. He has not done any high iron construction work since the accident. His legs pain considerably and his knee hurts upon work and his left arm is disabled. His overall physical condition was below his normal state of well-being prior to the accident. His leg was still scarred at the time of the trial from the burns received when he was cut out of the steel. His special damages, including loss of wages, were about $7,500.

The plaintiff Donald E. Engel was treated by Dr. Terrell. He was complaining of injury to both knees and upon examination showed lacerations and other injuries in the knee area. Sutures were required to close part of the wounds on each leg. X rays were ordered which were negative. Dr. Terrell diagnosed the ankle injury as a sprain. He was treated in the office on May 6th and on May 9th the sutures were removed. He was last seen by Dr. Terrell with reference to the legs on December 23, 1960, at which time they had healed well. Engel tried to return to work

73

two weeks after the accident but broke the stitches loose in his leg and was then off work after that for a month or two. In addition he had numbness of the left hand and arm and stiffness in the shoulders and neck and upper portions of his back. He also had had three or four dizzy spells since the accident up to the time of trial, which according to Dr. Terrell could be connected with the accident, but which he could not say were. He still had some scars on his leg as a result of the occurrence and that plus the headaches were the only residuals from the accident at the time of trial. He no longer does any of the red iron (structural steel) work because of the generally unnerving effect of the collapse of the roof. His special damages, including loss of income, were less than $1500.

The agreement of April 14, 1959, between Community Unit School District No. 2, Macon County, Maroa, Illinois, the owner, and DeWitt-Amdal & Associates, the architect, plaintiffs' Exhibit No. 4, provided, in part, so far as material:

> "The Architect agrees to perform, for the above named work, professional services as hereinafter set forth.
>
> . . . . . .
>
> The Parties hereto further agree to the following conditions:
>
> 1. The Architect's Services: The Architect's professional services consist of the necessary conferences, the preparation of preliminary studies, working drawings, specifications, large scale and full size detail drawings, for architectural, structural, plumbing, heating, electrical, and other mechanical work; obtaining approval of governmental agencies having jurisdiction over certain phases of the work consisting of Fire Marshal, Health Department, County Superin-

74

tendent of Schools, and Department of Education; assistance in the drafting of forms of proposals and contracts; the issuance of Certificates of Payment; the keeping of accounts, and the general administration of the construction contracts, and supervision of the work.

. . . . . .

6. Supervision of the Work: The Architect will endeavor to guard the Owner against defects and deficiencies in the work of contractors, but he does not guarantee the performance of their contracts. The supervision of an Architect is to be distinguished from the continuous personal superintendence to be obtained by the employment of a clerk-of-the-works.

When authorized by the Owner, a clerk-of-the-works acceptable to both Owner and Architect shall be engaged by the Architect at a salary satisfactory to the Owner, and paid by the Owner, upon presentation of the Architect's monthly statements."

The agreement of September 14, 1959, between Fisher-Stoune, Inc., the general contractor, and Community Unit School District No. 2, Macon & DeWitt Counties, Illinois, the owner, plaintiffs' Exhibit No. 5, provided, in part, so far as relevant:

"Article 1. Scope of the Work.

The General Contractor shall furnish all of the materials and perform all of the work to complete the General work shown on the drawings and described in the specifications entitled 'Second Addition to Maroa High School, Community Unit School District #2, Macon & DeWitt Counties, Illinois.'

75

Drawings: 1 through 17, and S–1 through S–8, dated 7–27–59.

Specifications: Pages 1 through 90.

Addenda #1, dated Aug. 10, 1959,
#2, dated Aug. 12, 1959.

prepared by DeWitt-Amdal & Associates, Architects, acting as and in these Contract Documents entitled the Architect; and shall do everything required by this Agreement, the General Conditions of the Contract, the Specifications, and the Drawings, and/or as follows:

. . . . . .

Article 6. The Contract Documents.

The General Conditions of the Contract, the Specifications and the Drawings, together with this Agreement, form the Contract, and they are as fully a part of the Contract as if attached or herein repeated.

12. Protection of Work and Property:

The Contractor shall continuously maintain adequate protection of all his work from damage and shall protect the owner's property from injury or loss arising in connection with this Contract. He shall make good any such damage, injury or loss, except such as may be directly due to errors in the Contract Documents or caused by agents or employees of the Owner, or due to causes beyond the Contractor's control and not to his fault or negligence. He shall adequately protect adjacent property as provided by law and the Contract Documents.

The Contractor shall take all necessary precautions for the safety of employees on the work, and

76

shall comply with all applicable provisions of Federal, State, and Municipal safety laws and building codes to prevent accidents or injury to persons on, about or adjacent to the premises where the work is being performed. He shall erect and properly maintain at all times, as required by the conditions and progress of the work, all necessary safeguards for the protection of workmen and the public and shall post danger signs warning against the hazards created by such features of construction as protruding nails, hoists, well holes, elevator hatchways, scaffolding, window openings, stairways and falling materials; and he shall designate a responsible member of his organization on the work, whose duty shall be the prevention of accidents. The name and position of any person so designated shall be reported to the Architect by the Contractor.

. . . . . .

13. Inspection of Work:

The Architect and his representatives shall at all times have access to the work wherever it is in preparation or progress and the Contractor shall provide proper facilities for such access and for inspection.

If the specifications, the Architect's instructions, laws, ordinances or any public authority require any work to be specially tested or approved, the Contractor shall give the Architect timely notice of its readiness for inspection, and if the inspection is by another authority than the Architect, of the date fixed for such inspection, required certificates of inspection being secured by the Contractor. Inspections by the Architect shall be promptly made, and where practicable at the

77

source of supply. If any work should be covered up without approval or consent of the Architect, it must, if required, by the Architect, be uncovered for examination at the Contractor's expense.

Re-examination of questioned work may be ordered by the Architect and if so ordered the work must be uncovered by the Contractor. If such work be found in accordance with the Contract Documents the Owner shall pay the cost of re-examination and replacement. If such work be found not in accordance with the Contract Documents, the Contractor shall pay such cost, unless he shall show that the defect in the work was caused by a Contractor employed as provided in Article 35, and in that event the Owner shall pay such cost.

14. Superintendence: Supervision:

The Contractor shall keep on his work, during its progress, a competent superintendent and any necessary assistants, all satisfactory to the Architect. The superintendent shall not be changed except with the consent of the Architect, unless the superintendent proves to be unsatisfactory to the Contractor and ceases to be in his employ. The superintendent shall represent the Contractor in his absence and all directions given to him shall be as binding as if given to the Contractor. Important directions shall be confirmed in writing to the Contractor. Other directions shall be so confirmed on written request in each case.

The Contractor shall give efficient supervision to the work, using his best skill and attention. He shall carefully study and compare all drawings, specifications and other instructions and shall at once report to the Architect any error,

78

inconsistency or omission which he may discover, but he shall not be held responsible for their existence or discovery.

. . . . . .

15. Changes in the Work:

. . . . . .

In giving instructions, the Architect shall have authority to make minor changes in the work, not involving extra cost, and not inconsistent with the purposes of the building, but otherwise, except in an emergency endangering life or property, no extra work or change shall be made unless in pursuance of a written order from the Owner signed or countersigned by the Architect, or a written order from the Architect stating that the Owner has authorized the extra work or change, and no claim for an addition to the contract sum shall be valid unless so ordered.

. . . . . .

19. Correction of Work Before Final Payment:

The Contractor shall promptly remove from the premises all work condemned by the Architect as failing to conform to the Contract, whether incorporated or not, and the Contractor shall promptly replace and re-execute his own work in accordance with the Contract and without expense to the Owner and shall bear the expense of making good all work of other contractors destroyed or damaged by such removal or replacement.

. . . . . .

20. Correction of Work After Final Payment:

The Contractor shall remedy any defects due to faulty materials or workmanship and pay for any

damage to other work resulting therefrom, which shall appear within a period of one year from the date of final payment, or from the date of the Owner's substantial usage or occupancy of the project, whichever is earlier, and in accordance with the terms of any special guarantees provided in the contract. Neither the foregoing nor any provision in the contract documents, nor any special guarantee time limit, shall be held to limit the Contractor's liability for defects, to less than the legal limit of liability in accordance with the law of the place of building. The Owner shall give notice of observed defects with reasonable promptness. All questions arising under this Article shall be decided by the Architect subject to arbitration, notwithstanding final payment.

. . . . . .

38. Architect's Status:

The Architect shall have general supervision and direction of the work. He is the agent of the Owner only to the extent provided in the Contract Documents and when in special instances he is authorized by the Owner so to act, and in such instances he shall, upon request, show the Contractor written authority. He has authority to stop the work whenever such stoppage may be necessary to insure the proper execution of the Contract.

As the Architect is, in the first instance, the interpreter of the conditions of the Contract and the judge of its performance, he shall side neither with the Owner nor with the Contractor, but shall use his powers under the Contract to enforce its faithful performance by both.

. . . . . .

80

**39. Architect's Decisions:**

The Architect shall, within a reasonable time, make decisions on all claims of the Owner or Contractor and on all other matters relating to the execution and progress of the work or the interpretation of the Contract Documents.

The Architect's decisions, in matters relating to artistic effect, shall be final, if within the terms of the Contract Documents.

Except as above or as otherwise expressly provided in the Contract Documents, all the Architect's decisions are subject to arbitration.

**42. Use of Premises:**

The Contractor shall not load or permit any part of the structure to be loaded with a weight that will endanger its safety.

**55. Protection:**

Bracing, Shoring and Sheeting: The Contractor shall provide all bracing, shoring and sheeting as required for safety and for the proper execution of the work, and have same removed when the work is completed.

**59. Temporary Office:**

The Contractor shall at all times provide and maintain a watertight office where directed, for use of the Architect, Subcontractors, and Contractor. This building shall be removed when directed.

This Office shall be heated, and provided with windows which operate, doors with locks, tables, benches, and racks for drawings.

. . . . . .

IV–31. Lightweight Concrete Roof Fill, Cants and Saddles:

Lightweight concrete roof fill, cants and saddles are specified elsewhere.

Section VII

STRUCTURAL STEEL

VII–2. Scope of Work:

This Contractor shall furnish all labor and materials to complete all structural steel as shown on the drawings or herein specified, or both, as follows:

Fabrication of steel herein specified or shown on drawings, and that may be required for a complete job, except such steel as will be furnished by others. (See Steel Joists and Miscellaneous Iron and Steel.)

Erection of all steel work.

Columns, beams, channels, hangers, separators, stiffeners, brackets, trusses, plates, anchors, nuts, bolts, rivets, all connections, etc., as required to complete the work of this section.

Loose lintels, beams, and bearing plates for same.

Holes, cutting, etc., providing for the installation of other work as may be required by others and shown on the drawings or herein specified.

Painting steel as specified one shop coat and one field coat.

Submit shop drawings in accord with Paragraph I–5, General Conditions.

Standards: All steel shall be designed, fabricated, and erected in accord with the specifications for the Design, Fabrication, and Erection of Structural Steel for Buildings, as amended to date, and the Code of Standard Practice, latest edition, as adopted by the American Institute of Steel Construction, Inc., unless herein specified to the contrary, in which case these specifications shall govern and supersede the standards.

. . . . . .

VII–20. Shoring and Alterations:

Existing structural steel shall be carefully shored and braced as required for installation of new connecting steel. Existing truss reused shall be carefully removed, revised and re-erected as called for. Provide new connections for existing trusses and other structural steel members as required by new work."

The defendants architects' theories are that they were entitled to directed verdicts and judgments notwithstanding the verdicts; the trial court improperly dismissed the third-party complaint; the verdicts for the plaintiffs were against the manifest weight of the evidence; the trial court committed numerous errors in refusing to grant a mistrial, in the admission of improper evidence, in permitting improper cross-examination, in allowing improper argument, in the giving of improper instructions, in refusing to give proper instructions, and in leaving to the jury the construction of a statute and of a written contract; and that the verdicts are excessive.

The plaintiffs' theory of the case as to the verdicts and judgments against the defendants architects is that:

The jury's verdicts in favor of the plaintiffs against DeWitt-Amdal are supported by the law and the evidence; in that

1. There was ample evidence of negligence.

2. There was substantial proof that DeWitt-Amdal were in charge of the work.

3. There was proof of the duty of DeWitt-Amdal to inspect, supervise and to stop the work if it endangered life or property.

4. There was proof of the failure to comply with that duty.

5. The evidence showed that through the breach of that duty, the supporting scaffolding collapsed and the plaintiffs' injuries proximately resulted.

6. The evidence supported the jury's finding that the work in question was within the purview of the Structural Work Act and that the plaintiffs' injuries were the result of a violation thereof.

7. The trial court did not commit reversible error in any of its rulings on the evidence, arguments or instructions.

8. The rulings of the trial court dismissing the third-party complaint have no bearing on these verdicts.

The plaintiffs' theory of the case as to the verdict and judgment for the defendant School District is that:

The jury's verdict in favor of the defendant Maroa Community School District No. 2 against the plaintiffs is contrary to the manifest weight of the evidence; in that,

1. The evidence is undisputed that the School District retained general control over the entire work throughout the events leading up to the collapse.

2. The School District acted as its own general contractor letting three separate contracts for the work.

3. The School District, together with its architects DeWitt-Amdal, retained the right to stop the work whenever necessary to insure safety of person or property.

4. The School District, acting through its superintendent, actively participated in the location of the scaffolding which collapsed.

5. The School District was an owner in charge of the work within the purview of the Structural Work Act.

The defendant School District's theory of the case is:

(a) The evidence shows that this defendant was not in charge or control of the work and therefore is not liable to plaintiffs.

(b) At most the question of whether this defendant as owner had charge or control of the work was a question of fact for the jury, which question was rightfully decided by the jury in favor of this defendant.

The third-party defendant Fisher-Stoune, Inc.'s theory of the case is that:

1. The trial court properly dismissed the architects' third-party complaint against the general contractor. When the third-party complaint was dismissed, the architects chose not to appeal at that time. Instead, they proceeded to trial, and attempted to convince the jury they were not at fault. They pointed to the absent general contractor and claimed the fault was his. Now that the jury verdict is in, the architects want this court to disregard that verdict in considering the trial court's dismissal of the third-party complaint.

2. But the jury verdict in favor of the plaintiffs and against the architects is based upon the architects' active negligence and their wilful violation of the Illinois Structural Work Act. The architects have been found to be active wrongdoers, and active wrongdoers are not entitled to indemnity. In their claimed right to indemnity, the architects are precluded by the jury verdict against them from denying either their wilful violation of the Scaffold Act or their active negligence.

3. If the architects are successful on this appeal in their contention that the trial court should have directed a verdict in their favor and against the plaintiffs, they will not be liable to the plaintiffs and they will then have no reason to seek indemnity.

4. Whether the architects are liable or not, they have no right of indemnity against the general contractor; the architects' third-party complaint was legally insufficient to state a cause of action and was properly dismissed.

The only Illinois case relating to architects cited by any of the parties is Lotholz v. Fiedler, 59 Ill App 379 (1895). This was a suit by the architect against the owner to recover for work in preparation of plans, etc., and in superintending the building of a home. The architect was employed to 'draw plans and specifications and superintend the construction of the home. The building contracts, inter alia, provided:

> "Section 5. The proprietor has engaged August Fiedler to be superintendent and agent in the premises. The duties of this office being to enforce all the conditions of the contract, and to furnish all the necessary drawings and information that are required to properly illustrate and explain the design given."

The home was defective in several important matters. A chimney was imperfectly constructed; it was not plastered as the specifications required; there were cracks in it out of which smoke poured when the furnace was lighted. Some windows admitted rain because mortar had not been put at the sides; the mouldings had to be removed and the space packed with oakum. Nails were driven through some plumbing pipes and they leaked. The window weights were by the contract to be of lead. They were mostly iron. The owner admitted an indebtedness of $300. The architect had recovered a judgment for about $1,700. This was reversed and remanded unless the plaintiff remitted therefrom so as to leave it $300. The court said, in part, pp 380–381:

> "Appellee was not so much employed to detect the fact that the carpenters had driven nails through the plumbing pipes as he was to prevent this being done. He was to superintend, to enforce all the conditions of the contract, and most certainly he should have seen to it that nails were not driven through pipes.
>
> Such gross carelessness and imperfect construction it was his duty to have prevented.
>
> The window weights were, by written contract, to have been of lead; those put in were mostly iron. Appellee attempts to excuse this by showing that Mr. Lotholz was about the house at times during its construction, and that iron window weights were lying around which he must have seen. If Mr. Lotholz did see this, it did not change the written contract or relieve appellee from his duty to see that it was carried out.
>
> It is unnecessary to go over all the defects, imperfect construction of this house, which the evi-

dence shows existed, and for which no sufficient excuse is given.

Appellee is not, under the evidence presented by this record, entitled to be paid as if he had superintended so as to give appellant a house in accordance with the contracts, he, appellee, undertook to see fulfilled."

5 American Jurisprudence2d, relating to Architects, pp 662, 667, 668–669, 669–671, 686–687, 688–689, states that:

"An architect is one whose profession and occupation it is to form or devise plans and designs and draw up specifications for buildings or structures, and to superintend their construction. . . ."

. . . . . .

"The employment of an architect is ordinarily a matter of contract between the parties, and the terms of such employment are governed by the terms of the contract entered into. The architect's duties may be limited to the preparation of plans and specifications, or they may include, in addition, supervision of construction. . . ."

. . . . . .

"As a general rule, an architect, as far as the preparation of plans is concerned, acts as an independent contractor, but so far as regards the performance of his supervisory functions with respect to a building under construction, he ordinarily acts as the agent and representative of the person for whom the work is being done. An architect may, however, occupy the position of an independent contractor where he undertakes to execute the entire work, with the sole control thereof and of the employment and management

of those engaged therein; the question is one of fact which is determined by the circumstances of the particular case."

. . . . . .

"Upon general contract principles, an architect's contract in a form supplied by the architect is to be construed most strongly against him, and any ambiguity is to be resolved in favor of his employer." '

. . . . . .

"An architect, in contracting for his services as such, implies that he possesses skill and ability, including taste, sufficient to enable him to perform the required services at least ordinarily and reasonably well, and that he will exercise and apply in the given case his skill, ability, judgment, and taste reasonably and without neglect. The duty owing to his employer is essentially the same as that which is owed by any person to another where such person holds himself out as possessing skill and ability in some special employment and offers his services to the public on account of his fitness to act in the line of business for which he may be employed. An architect holds himself out as an expert in his particular line of work and is employed because he is believed to be such.

The skill and diligence which he is bound to exercise are such as are ordinarily required of architects. Thus, an architect, in the preparation of plans and drawings, owes to the person employing him the duty to exercise his skill and ability, his judgment and taste, reasonably and without neglect, and the efficiency of an architect in the preparation of plans and specifications is tested by the rule of ordinary and rea-

89

sonable skill usually exercised by one in that profession. He must guard against defects in the plans as to design, materials, and construction, and he must keep abreast of the improvements of the times. The duty of the architect also depends on the particular agreement entered into with his employer, and he may expressly contract that his plans will be satisfactory. The architect's undertaking, however, in the absence of a special agreement, does not imply or guarantee a perfect plan or satisfactory result, and he is liable only for failure to exercise reasonable care and skill. The degree of skill and care which may be required of an architect in the preparation of his plans has been held to be a question for the jury."

. . . . . .

". . . An Architect will also be held liable for damage sustained by his employer where, by reason of the architect's breach of his duty to exercise care and skill, his plans and specifications were faulty and defective as to design, materials, or construction; and an architect who undertakes to draft plans and specifications for a building, and also to act in the capacity of contractor in its construction, cannot, after he has executed his contract as an architect, successfully contend that, his employment having changed to that of a builder, he is no longer responsible for the results of a defective plan. However, in the absence of any special agreement in that regard, an architect's undertaking does not imply or guarantee a perfect plan or satisfactory result, and there is no assurance that miscalculations will not occur. Liability rests only on unskilfulness or negligence, and not upon mere errors of judgment, and the question of the architect's neg-

90

ligence in the preparation of plans is one of fact and within the province of the jury. . . ."

. . . . . .

"An architect may be held liable for negligence in failing to exercise the ordinary skill of his profession, which results in the erection of an unsafe structure whereby anyone lawfully on the premises is injured. An architect's liability for negligence resulting in personal injury or death may be based upon his supervisory activities or upon defects in the plans. The liability of the architect, moreover, is not limited to the owner who employed him; the modern view is that privity of contract is not a prerequisite to liability. As in other negligence cases, however, there can be no recovery against the architect unless it can be established that his negligence was the proximate cause of the personal injury or wrongful death sued for. . . ."

 An architect who plans and supervises construction work, as an independent contractor, is under a duty to exercise ordinary care in the course thereof for the protection of any person who foreseeably and with reasonable certainty may be injured by his failure to do so: Montijo v. Swift, 33 Cal Rptr 133 (Cal App 1963) (suit by pedestrian descending a stairway in a bus depot for injuries in a fall, against the architect who planned and supervised the renovation and reconstruction of the stairway—judgment for the defendant notwithstanding the verdict reversed and order for new trial affirmed). If an architect as a part of his agreement with the owners as to construction of a residence undertook to approve and did approve a certain type system of heating and air conditioning and to supervise installation thereof, he has a duty to exercise reasonable care, technical skill,

and ability in the performance thereof, and whether or not he so exercised such is a question to be determined by the jury: Willner v. Woodward, 201 Va 104, 109 SE2d 132 (1959) (suit by home owners against architect for damages allegedly due to negligent plans, negligent approval of plans of others, and negligent supervision of construction, relating to the heating and air conditioning system, the plans being inadequate in not requiring ducts to be encased in concrete and not providing a fire wall, the architect not having inspected the duct work and having relied on the design and system of the contractor—summary judgment for defendant reversed and remanded). It is the duty of an architect to act with reasonable diligence in the performance of his duties; the determination of the question of the architect's failure to meet this duty is one of fact; the skill and ability he is bound to exercise are such as are ordinarily required of architects; when the contract between the architect and owner requires inspection and supervision during construction he must exercise the same degree of care in the performance of that duty; where a heating engineer acts solely under the direction of the architect and the architect by his contract with the owner is directly responsible for the design and supervision of installation of the heating system, the architect may be liable for the malpractice of his agent; the failure of the architect to make any variation in the method of installation of a substitute material (tin plated steel tubing) for copper tubing in a radiant heating system, the metals being different in their expansion and ductable characteristics, he knowing nothing of the substitute material, having made no independent effort to ascertain its true suitability, or whether it could be safely installed in the same manner as copper tubing, may be a failure to exercise the required degree of skill: Scott v. Potomac

Ins. Co. of Dist. of Columbia, 341 P2d 1083 (S Ct Ore 1959) (suit by architects for amounts expended to settle claims against them for alleged malpractice, against their professional liability insurer—judgment for plaintiffs affirmed). When an architect is contractually obligated to the United States (the owner) to prepare plans and specifications for and supervise the construction of a school building, and under the contractor's agreement with the owner the architect has the general supervision and direction of the work and authority to stop the work whenever necessary to insure specified performance, the position and authority of the supervising architect are such that he ought to labor under a duty to the contractor to supervise the project with due care under the circumstances, even though his sole contractual relationship is with the owner; too much control over the contractor necessarily rests with the supervising architect for him not to be placed under a duty imposed by law to perform without negligence his functions as they affect the contractor; the power of the architect to stop the work alone is tantamount to a power of economic life or death over the contractor and such authority, exercised in such a relationship, carrys commensurate legal responsibility: United States v. Rogers & Rogers, 161 F Supp 132 (USDCSD Calif 1958) (counterclaim by contractor against the architect, inter alia, the gravamen of which was negligent supervision, the architect negligently construed and interpreted reports of tests on certain concrete, negligently approved concrete bents made thereof which were the skeleton of the building, when he should have known the concrete failed to meet specifications, negligently authorized or ordered the bents incorporated in that building, and because the concrete failed to meet specifications a state agency refused to pass them, and the architect then stopped the work, and

93

the contractor was damaged by compensating for the defective bents and by delay—the counterclaim states a proper claim, genuine issues of material fact are presented, and the architect's motion for summary judgment was denied).

Erhart v. Hummonds, 334 SW2d 869 (S Ct Ark 1960), and Fidelity & Casualty Co. of New York v. J. A. Jones Const. Co., 325 F2d 605 (CA 8th, 1963) may be considered together, particularly in understanding the facts, inasmuch as they arose out of the same occurrence. The owner employed the architects to draw plans for a commercial building. That was done. The owner then entered into a construction contract with a general contractor. The owner then employed the architects to supervise the construction, for an additional fee. There was no written contract between the architect and the owner. The general contractor subcontracted the excavation work to another party. The plans for excavation were in some detail in the contract. The walls had to be shored to prevent sliding and caving. The field supervisor for the architects raised questions about certain of the shoring. The architects asked the general contractor to send a new job superintendent. He arrived on a Friday and promised the shoring in question would be done Monday. It rained over the weekend. The excavation walls softened. On Monday as the field supervisor of the architects drove his car near the embankment wall in question it caved in. Three employees of the subcontractor or contractor were killed and another injured. The architects were sued for the deaths and injuries. Judgments for the plaintiffs were affirmed. The building contract required the architects to inspect the excavation upon completion and before commencement of the concrete work. The City Building Code provided that all excavations shall be protected and guarded against danger to life and

94

property. The general contractor's contract provided he should erect such protection as may be required, or as directed by the architect, maintain it, and any existing protections in accordance with laws, rules, regulations, and ordinances, and do all shoring necessary to maintain banks of excavations, to prevent sloughing or caving, and to protect workmen. That contract also said the architect should have general supervision and direction of the work, and authority to stop the work when necessary to insure proper execution of the contract (the provisions concerning the architect's status being identical to those in "par 38 Architect's Status" of the Agreement here between the general contractor and the owner). The City Building Code required the employment of an architect or engineer to supervise the construction, under the circumstances here, and provided that such supervision should extend to all important details of framing, erection, and assembly, and he should render full inspection service and adequate supervision, and he should have authority to compel removal of defective materials or suspend or stop work pending ruling of the building inspector. The Supreme Court of Arkansas, 334 SW2d 860, said there was substantial evidence the architects breached a duty owed to the workmen whom the safety provisions of the contract specifically named; the architects were paid to see to it that the terms of the contract between the owners and contractors were complied with; it was a question for the jury as to whether the architect was negligent in failing to stop all work until the shoring on the east wall was made safe for the workmen; and there was substantial evidence the presence of the field supervisor's car caused the cave in. Fidelity & Casualty Co. of New York v. J. A. Jones Const. Co. was a later action for indemnity by the liability insurers for the architects, who had paid the judgments,

95

against the general contractor. A judgment dismissing the complaint was affirmed. The case will be later referred to, but these observations of the Court of Appeals may be presently noted: The architect's status went beyond that of agent or employee of the owner; both the general contractor and the architects by virtue of their contracts with the owner were required to exercise care and skill for the protection of employees and the public; there was substantial evidentiary support for the jury's finding the architects guilty of negligence proximately causing the deaths and injuries; the evidence was conflicting as to the steps taken by the architects in performance of their duties; they were aware of the inadequacy of the bracing; and there was a fact issue whether they had assurance from the general contractor the defects would be remedied.

In Clay v. A. J. Crump and Sons, Ltd., 3 All England Law Reports, 687 (CA 1963), the owners of a commercial site employed a demolition contractor to demolish an old building thereon and excavate the site, employed a contractor to erect a new building thereon, and employed an architect to prepare plans and to supervise both the demolition and construction. The plans provided for temporarily retaining a 5' bank of earth at the base of a particular wall. That wall also was supported in part by 2 other walls at right angles, like buttresses. The were all ultimately to be demolished. When that wall was about to be demolished the owners asked the demolition contractor's foreman if it could be left standing for a while. The foreman asked the demolition contractor, who asked the architect, the architect asked the demolition contractor if it was safe, he thought it was, he looked, relied on his foreman's opinion, and that wall was left standing. The architect did not at that time look to see if the wall was safe or give any instructions

for precautions to leave it safe. Later when the architect visited the site, and later when the demolition contractor left the site, the two buttressing walls had been demolished and the excavation had been done so close to the wall in question as to expose the foundation thereof. An expert would have seen it was dangerous. Such would not have been obvious to a layman. The architect did not then examine it carefully, nor did the demolition contractor. Later the building contractor started work. He inspected the wall only cursorily. The wall collapsed later and the plaintiff employee of the building contractor was injured. The plaintiff sued the architect and others, recovered a judgment, and this appeal was dismissed. The court held the architect owed a duty of care to the plaintiff since it must have been reasonably within the architect's contemplation when directing his mind to whether the wall should be left standing that such a person as the plaintiff would be affected by his decision and he knew or ought to have known the building contractor's examination would likely be cursory in reliance on his having left the site safe; the architect failed to take steps to satisfy himself that the wall was safe to be left, though he had opportunity to do so, and left it standing and unsafe, on the opinion of the demolition contractor; that the building contractor had a last opportunity to examine the wall did not break the chain of causation—the architect's negligence was a cause of the injuries. The wall was in a dangerous state. The fact it fell as it did is probably sufficient to establish that. There was other evidence a wall in that condition would be unsafe. This should have been apparent to anyone making even a cursory examination. Because an architect, instead of making sure for himself, accepts an opinion of someone else, the architect is not free from liability. He cannot appoint an agent to act for him

97

to give a decision which it is his duty to give himself. He cannot delegate to others duties he is obliged to perform.

The cases the defendants architects refer to on this phase of the cause are: Clinton v. Boehm, 139 App Div 73 (ADSCNY 1910); Potter v. Gilbert, 130 App Div 632 (ADSCNY 1909) 196 NY 576; Olsen v. Chase Manhattan Bank, 10 App Div2d 539 (ADSCNY 1960) 9 NY2d 829; Paxton v. County of Alameda, 119 Cal App2d 393 (DCA Cal 1953); and Day v. National U. S. Radiator Corp., 241 La 288 (1961).

In Clinton v. Boehm, the plaintiffs architects sued the owners for fees for preparing plans and specifications for and superintending the construction of a building. The counterclaim of the defendants alleged the plaintiffs agreed to act as architects, to make the plans, etc., and to superintend the construction and erection and the contractors and laborers, and to use their best skill and endeavour; in constructing the building, elevators, etc., were used to lift material, operating in shafts, as the plaintiffs knew; the plaintiffs permitted the contractors to perform the work contrary to the laws of the State of New York by permitting the shafts to remain unguarded and without barrier; and a certain employee (of a contractor) fell through a shaft, was killed, his administrator had sued the defendants and recovered judgment which the defendants will be obliged to pay. The plaintiffs' demurrer had been overruled. This was reversed. The laws of New York referred to in the counterclaim were parts of a former labor law requiring contractors or owners to protect by barriers the shafts in buildings in course of construction where elevators, etc., are used. The court held the labor laws involved had nothing to do with construction of the building, were solely to protect the workmen, and the plaintiffs architects had no duty to

98

compel observance by the contractors thereof; the court further held the counterclaim did not allege the defendants had paid the judgment and such was essential in an action against an alleged indemnitor. The limited actual holding of the case has no bearing on the case at bar. A case can be a precedent only for what it actually decides. In the course of the opinion the court observed that the architects had no greater duty than to be reasonably vigilant to see that the plans and specifications were followed, that proper material was used, the building laws complied with, and that the owners receive such a building as is contracted for—they must exercise reasonable care and skill in those regards. As far as it goes, it would appear there can be no quarrel with that, and that was all that was necessary to be said as to the limited actual holding of the case, but, query, whether an architect under certain other and additional facts and circumstances (not there involved) may not have a further duty or duties. The further observation of the opinion that the utmost obligation of the architects was to see that the building was properly constructed, and if that result was achieved they were not called upon to watch and inspect every means adopted by the contractors in fulfilling their contract, was not essential to the particular decision, is dicta, and is too general in character. That case arose on the pleadings, not after trial, and from such limited information as to the facts as is given in the pleadings the facts were not substantially the same as in the case at bar.

In Potter v. Gilbert, the complaint was for the death of an employee of a contractor who was erecting a building for an owner, due to the collapse of a wall in the process of construction, allegedly caused by the defendant architect's negligence. The complaint, so far as material, alleged the architect had agreed to supervise, and did supervise the erection

99

of the building for the owner, and that he failed to exercise due diligence in supervising the construction. The defendant architect's demurrer had been sustained, and this was affirmed. The court held the complaint charges merely an *omission of duty* of the architect, which constitutes only *nonfeasance,* for which he may be liable to the owner, his employer, but *is not liable to third parties*—the architect had no duty towards employees of the contractor to remain on the premises and be vigilant in scrutinizing the work of the contractor—and the complaint failed to state a cause of action. We do not understand it to be the law of Illinois that an omission of duty—nonfeasance—can never subject a defendant to possible liability to a third party. Nor do we believe the defendants architects here urge that broad a view—they filed no motion to dismiss or strike the complaint here, which would have been an orthodox and simple way to present that question—they answered the complaint. But apparently that was the law of New York at least at the time of Potter v. Gilbert, and is another reason for distinguishing the somewhat similar Clinton v. Boehm case in the same jurisdiction which arose just a year after the Potter case. Again, the Potter case, like the Clinton case, arose on the pleadings and evidently the facts, so far as they were alleged, were not in a substantial degree the same as in the present case.

In Olsen v. Chase Manhattan Bank, the bank was the owner of the premises. The Foundation Contractors were laying the foundations for a building. The plaintiff employee of the Foundation Contractors was injured when struck by a pneumatic drill which fell from a temporary platform above him. The defendants architects had been employed to perform architectural services, including supervision of construction. The defendants engineers had been employed

100

by the architects to perform engineering as to the foundations and supervision. There were some pre-existing foundation walls or caissons in the excavation and the architect's plans called for their removal. But the Foundation Contractors had been using some of the caissons temporarily—having constructed platforms of timbers using the caissons as supports. Those platforms were not a part of the architect's plans. The omission to demolish them and the use thereof were on the orders of the Foundation Contractors and the architects' approval was not required for temporary platforms. It was from one of those platforms that the drill fell. There was an open space between one part of the platform and the caisson and had been for several weeks and a pile of drills was on the platform near that space. The contract of the owner and Foundation Contractors provided the Contractors were to furnish all labor, materials, etc., to perform the substructure work, and have sole supervision and direction and control, except they must remove any workman whom the owner, architects or engineers considered unfit. The contract of the owner and architects provided the architects were to prepare plans, specifications, have complete supervision of the work, supervision and control over the work of the various contractors, general administration and supervision to furnish the owner a finished building in conformance with the drawings. The contract between the architects and engineers—pursuant to the owner-architects' contract—said the engineers were to act as to the foundations, furnish plans, provide general supervision. The engineers were on the site continuously. One of the architects was there once a week. The verdict of the jury was against the architects and engineers and in favor of the owner bank. The court set aside the verdict in favor of the bank. The Appellate Division held the judgment

101

should be reversed, the complaint dismissed as to the architects, and the verdict reinstated in favor of the owner, saying that the accident occurred because of the manner in which a detail of the contractor's work was being performed, and as to the architects and engineers they could be charged only with nonfeasance, for which it is possible they could be liable to the owner but not to the plaintiff third party. The Court of Appeals affirmed, holding the architects' and engineers' supervisory function was to insure performance of the construction work in accordance with the plans and specifications, to see that standards of safety were met in relation to the permanent construction, but not the safety of temporary platforms used in connection with permanent construction work, and they had no duty to the plaintiff third party—and there being no duty the Court of Appeals did not reach the question of liability to a third party for nonfeasance. Some of the important facts there are variant from those in the present case. The particular platform involved was only a temporary platform on and from which employees worked. It did not even temporarily support any permanent part of the structure. It was not only not provided for in the architect's plans but the omission to demolish and remove the old caissons on which the platform rested was directly contrary to the architect's plans. Again, the basis on which the Appellate Division places its determination, and for which it cited the Potter v. Gilbert and Clinton v. Boehm cases, supra, from the same jurisdiction, as to the architects and engineers—which is believed not to be the law of Illinois and is not so urged by the defendants architects here—weakens the persuasiveness of the case, as does the difference in the ratio decidendi of the Appellate Division and the Court of Appeals. The cases are of limited cogency.

102

In Paxton v. County of Alameda, the plaintiff was injured while applying tar and gravel to the roof of a building under construction by the defendant County. The roof sheathing gave way. He was an employee of the roofing subcontractor. He sued the County and the architects who had designed the building and prepared the plans and specifications. A judgment was entered against all the defendants. The district Court of Appeal reversed as to the defendants architects and affirmed as to the defendant County. The complaint as to the architects was that they negligently specified 1″ x 6″ sheathing with a spread of 30″ between rafters, which was too thin, resulting in a dangerous condition for workmen applying the surface, which the architects should have known. The complaint as to the County was it negligently approved the plans and specifications, and also that some sheathing of lower grade than specified was used and the County knew thereof through agents appointed to supervise and inspect. The district Court of Appeal held the evidence did not sustain the finding the architects were negligent in the plans and specifications —which called for Douglas fir, select, merchantable, seasoned 1″ x 6″, laid horizontally, nailed with 2 nails at each bearing—they had carefully computed the loads the sheathing was to bear and the strength and stress of materials and specified a material having a wide margin of safety. It was also held the County was not negligent in approving the plans and specifications, but the County was liable because sheathing of insufficient strength and of a lower grade than specified was actually used in the construction, that the architects had authority to remedy the condition, had notice thereof, and failed to do so, they being employed also to direct and supervise the erection, etc., having seen deviations in the sheathing on the

ground but not having again inspected until after the sheathing was in place on the roof. The nature of the complaint and the facts are different from those presently involved. The only complaint of the plaintiff against the architect there was of alleged negligence in the plans and specifications—not in any supervision—and on the particular facts there presented, which are not analogous to those here, they were held not negligent. But the defendant County was held liable because the sheathing actually used was not as specified, was insufficient, and the architects had authority to remedy such and did not do so. By implication, at least, it would seem that had the complaint against the defendant architects been based on alleged negligent supervision (as well as alleged negligent plans and specifications)—which for some reason it was not—the court likely would have held the architects liable, consistent with its determination of the cause as against the defendant County.

In Day v. National U. S. Radiator Corp., an employee of a plumbing and heating subcontractor was killed by a boiler explosion during installation of a hot water system in a new building of the State of Louisiana. The suit was by the widow for herself and minor children. There were several defendants, including the architects and their insurer. The judgment was against the architects and their insurer and for the other defendants. The Court of Appeal, 117 So2d 104, had also held against the architects and their insurer and increased the awards, and affirmed as against the other defendants. The Supreme Court reversed. The State Building Authority had contracted with the architects to prepare plans and specifications, and for supervision of the work as to architectural, structural, plumbing, heating, electrical, and other mechanical work, they to exercise adequate supervision to reasonably insure strict conformity with drawings, etc.,

to inspect samples, materials, workmanship, to check shop drawings, and to make frequent visits to the site. The architects employed consulting engineers to propose plans, etc., for all mechanical and engineering equipment, to consult, to examine all shop drawings of the contractor and subcontractors and report, and to make a final inspection and report. The boiler was a part of the mechanical equipment—part of the domestic hot water system. The Building Authority had a contract with a general contractor. They had a subcontract with a plumbing and heating company for the heating, etc., and domestic hot water system. After installation the boiler was lighted by the subcontractor to test. It exploded. The architects' specifications provided the boiler was to have a thermostat and temperature and pressure relief valves, and in the installation the contractor was to make shop drawings which were to be submitted for approval and return, which if approved were approved for fabrication and placing orders. The plans and specifications were a part of the subcontract. The subcontractor submitted a shop drawing to the architects, who endorsed it "approved as noted" and returned it. It did not list a pressure relief valve for the boiler. The subcontractor installed the boiler without a thermostat and temperature and pressure relief valve. The architects and engineers were not notified of the test or requested to make any inspection before the test. The explosion was inevitable, under the circumstances. The architects had not visited the site after the installation or observed the absence of the safety devices. The Supreme Court held the architects had no duty to be aware the boiler was being installed by the subcontractor, or to inspect the hot water system during installation and before the test by the subcontractor; they had a duty to the owner that before final acceptance the building would be completed in ac-

cordance with the plans and specifications, and the owner received the building it had contracted for; they had no duty to supervise the contractor's method of doing the work; they had no control over the contractor's methods unless so provided in the specifications; the architects were not negligent in approving the subcontractor's shop drawing which did not specify a pressure relief valve for the boiler—the approval was only an approval for the subcontractor to place the order for purchase of the items listed and the shop drawing was not intended as a shop plan for fabrication or as showing construction details; and, further, the subcontractor did not use the shop plan anyway in the installation of the boiler, so its approval by the architects was not a proximate cause of the explosion. There was no breach of duty to the deceased by the architects or any fault on their part which was a proximate cause of the death. It may be observed the court referred to no precedents from Louisiana or elsewhere on the foregoing issues. The facts, of course, are not closely analogous to those involved in the case at bar. There was there no question as to the sufficiency of the architects' plans and specifications. Here such a question is presented. The architects there had not visited the site after the installation and observed the absence of the safety devices. The architects here had been at the site after installation of the columns or towers and had observed or had opportunity to observe their adequacy or inadequacy.

Under the agreement of the owner and the defendants architects here they were to perform professional services consisting of, so far as now relevant, conferences, preliminary studies, working drawings, specifications, large scale and full size detail drawings, for architectural, structural, plumbing, heating, electrical, and other mechanical work, etc., assisting in drafting proposals and contracts, etc., and the gener-

al administration of the construction contracts, and supervision of the work. They were to endeavor to guard the owner against defects and deficiencies in the work of contractors, but they did not guarantee the performance of the contractors' contracts. The supervision of the architects was to be distinguished from the continuous personal superintendence to be obtained by the employment of a clerk-of-the-works. In this case there was no clerk-of-the-works.

Under the agreement of the owner and the general contractor, so far as now relevant, the general contractor (Fisher-Stoune, Inc.) was to furnish all materials and perform all work to complete the general work shown on the drawings and described in the specifications prepared by the architects, and do everything required by the agreement, general conditions of the contract, specifications, and drawings. The contractor was to take all necessary precautions for the safety of employees on the work, comply with all applicable provisions of state safety laws to prevent accidents or injury to persons on, about or adjacent to the premises, and designate a responsible member of his organization on the work whose duty shall be the prevention of accidents, the name and position of such person to be reported to the architect. The architect was to have at all times access to the work wherever it is in preparation or progress, the contractor to provide proper facilities for access and inspection. If any work is required to be specially tested or approved the contractor shall give the architect timely notice of its readiness for inspection. Inspections by the architect were to be promptly made and where practicable at the source of supply. Work covered up without approval of the architect must, if required by the architect, be uncovered for examination. Reexamination of questioned work may be ordered by the architect and if so the work must be

uncovered by the contractor. The contractor must keep on the work during its progress a competent superintendent and any necessary assistants, satisfactory to the architect, and the superintendent shall not be changed except with the architect's consent. The contractor must give efficient supervision to the work, using his best skill and attention, and carefully study and compare all drawings, specifications and other instructions. The contractor must remove all work condemned by the architect as failing to conform to the contract, whether incorporated or not. The architect (par 38 "Architect's Status") shall have general supervision and direction of the work—he has authority to stop the work whenever such may be necessary to insure the proper execution of the contract—he is, in the first instance, the interpreter of the conditions of the contract and the judge of its performance, and shall use his powers thereunder to enforce its faithful performance by the owner and contractor. The architect shall, within a reasonable time, make decisions on all matters relating to the execution and progress of the work or the interpretation of the contract documents. The contractor must not have or permit any part of the structure to be loaded with a weight that will endanger its safety. He must provide all bracing, shoring and sheeting required for safety and for proper execution of the work. He must provide an office where directed for use of the architect and others. Lightweight concrete roof fill is specified. The contractor is to furnish all labor and materials to complete all structural steel as shown on the drawings or therein specified—fabrication of steel specified or shown on drawings—and erection of all steel work. The existing structural steel (the old west-east trusses) is required to be carefully shored and braced as required for installation of new connecting steel (the new north-south main bearing truss

and new east-west trusses). The existing truss reused (the old north-south proscenium truss) must be carefully removed, revised, and relocated as called for. The contractor must provide new connections for the existing trusses and other structural steel members as required by the new work.

To summarize and synthesize their particularly applicable functions, the defendants architects were to prepare preliminary studies, working drawings, specifications, large scale and full size detail drawings for the architectural and structural work, assist as to proposals and contracts, to have the general administration of the construction contracts and supervision of the work, and to endeavor to guard against defects and deficiencies in the work of contractors, subject to the qualifications that they did not guarantee performance of the contractors' contracts and their supervision was to be distinguished from the continuous personal superintendence of a clerk-of-the-works. Although we do not believe there is any significant applicable ambiguity in the several agreements and contract documents as to the architects' functions, if it be thought those qualifications lend some ambiguity the several documents, having been prepared by the architects, are to be construed, where construction is necessary, more strongly against them. They had general supervision and direction of the work—they had authority to stop the work whenever necessary to insure proper execution of the contract—they were, in the first instance, the interpreters of the contract and the judges of the performance—they had to use their powers thereunder to enforce its faithful performance—and they had to, within a reasonable time, make decisions on all matters as to the execution and progress of the work and interpretation of the contract documents. They had the use of an office on the job site. They were to have at all times

access to the work wherever it was in preparation or progress. Their inspections were to be promptly made and where practicable at the source of supply. They could require covered up work to be uncovered for examination, if covered without their approval. They could order reexamination of questioned work. The contractors' superintendent had to be a person satisfactory to them and he could not be changed without their consent. They could condemn any work as failing to conform to the contract, whether incorporated or not, and the contractor must remove such. The general contractor—the general administration of whose contract and supervision and direction of whose work was vested in the architects, who were to endeavor to guard against defects and deficiencies therein, who could stop the work when necessary, who were the first interpreters of the contract and first judges of its performance, who were to enforce its faithful performance and make decisions on all matters as to execution and progress of the work and interpretation of the documents—was to do the general work shown on the drawings and specifications and do everything required by the agreement, general conditions, specifications, and drawings—to take all necessary precautions for the safety of employees— to comply with all applicable state safety laws to prevent accidents or injury—to have a responsible member on the work to prevent accidents—to keep on the work a competent superintendent and any necessary assistants—to give efficient supervision to the work, using his best skill and attention, and carefully study and compare all drawings, specifications and other instructions—to not have or permit any part of the structure to be loaded as to endanger its safety— to provide all bracing, and shoring required for safety and proper execution of the work—to complete all structural steel—to carefully shore and brace existing

110

structural steel for installation of new steel—to carefully remove the existing truss reused—and to provide new connections for the existing trusses and other structural steel members.

Such were the functions of the defendants architects, including the things the general contractor was to do under his contract and his work, the general administration of which contract and supervision and direction of which work was vested in the architects.

The terms of the architects' employment are governed by the terms of the contracts entered into. Their duties here were not limited to the preparation of plans and specifications. They also included, in addition, supervision of construction. The architects in contracting for their services implied that they possessed skill and ability sufficient to enable them to perform the required services at least ordinarily and reasonably well and that they would exercise and apply in the case their skill, ability, and judgment reasonably and without neglect. They held themselves out as experts in their particular line of work and were employed because they were believed to be such. The skill and diligence which they were bound to exercise are such as are ordinarily required of architects. The efficiency of an architect in the preparation of plans and specifications is tested by the rule of ordinary and reasonable skill usually exercised by one in that profession. He must guard against defects in the plans as to design, materials, and construction, and he must keep abreast of the improvements of the times. In the absence of a special agreement their undertaking did not imply or guarantee a perfect plan or satisfactory results, and they are liable only for failure to exercise reasonable care and skill. The degree of skill and care which may be required of them in the preparation of their plans was a question for the jury. An architect will be liable where, by reason

111

of his breach of duty to exercise care and skill, his plans and specifications were faulty and defective as to design, materials, or construction. Liability rests on unskillfulness or negligence, not upon mere errors of judgment, and the question of the architect's negligence in the preparation of plans is one of fact and within the province of the jury.

The architects may be liable for negligence in failing to exercise the ordinary skill of their profession, which results in the erection of an unsafe structure whereby anyone lawfully on the premises is injured. Their possible liability for negligence resulting in personal injuries may be based upon their supervisory activities or upon defects in the plans or both. Their possible liability is not limited to the owner who employed them. Privity of contract is not a prerequisite to liability. They were under a duty to exercise ordinary, reasonable care, technical skill, and ability and diligence, as are ordinarily required of architects, in the course of their plans, inspections, and supervision during construction for the protection of any person who foreseeably and with reasonable certainty might be injured by their failure to do so, and whether or not they so exercised such is a question to be determined by the jury. The position and authority of the architects here, under these documents and these facts and circumstances, were such that they necessarily labor under a duty, inter alia, to supervise the project with due care under the circumstances. Too much control over the general contractor necessarily rests with the architects under these facts for them not to be placed under a duty imposed by law to perform without negligence all their functions, including plans, specifications, general administration of the construction contracts, and supervision and direction of the work. Their power to stop the work is, alone, a

112

drastic power, and that authority and all their other extensive authority as it relates to administration, supervision, and direction, necessarily carrys commensurate legal responsibility. The architects were to be paid, in part, to do their best to see to it that the terms of the contract between the owner and general contractor were complied with. They were employed, in part, not so much to detect the fact that the general contractor had erected inadequate temporary supports, shoring, columns, or towers, if they were inadequate, as they were to use their best efforts, skill, judgment, care, and experience to guard against and prevent that being done. Both the general contractor and the architects by virtue of their contracts with the owner and their positions were required to exercise care and skill for the protection of employees on the job. It must have been reasonably within the architects' contemplation when directing their minds to the removal and relocation of the old north-south proscenium truss, the removal of the north column and south column, the placing of the temporary supports, shoring, columns, or towers approximately under the west ends of the old west-east trusses which had theretofore rested on the proscenium truss or north and south columns, preparatory to installing the new north-south main bearing truss into which the west ends of the old west-east trusses and east ends of the new east-west trusses of the new addition were to fit and rest, that such persons as the plaintiffs, employees on the job, would necessarily be affected by the architects' several pertinent decisions in the course thereof.

See: Lotholz v. Fiedler, supra; 5 Am Jur2d, p 662 ff, supra; Montijo v. Swift, supra; Willner v. Woodward, supra; Scott v. Potomac Ins. Co. of Dist. of Columbia, supra; United States v. Rogers & Rogers,

113

supra; Erhart v. Hummonds, supra; Fidelity & Casualty Co. of New York v. J. A. Jones Const. Co., supra; Clay v. A. J. Crump and Sons Ltd., supra.

The defendants architects urge that under a contract to "supervise the work" of construction, an architect undertakes only a duty to see that a building is constructed, which, when completed, meets the plans and specifications and is the building for which the owner contracted, and that he has no rights or duties with regard to the manner or means or techniques of construction adopted by the contractor to produce that end result. One of the defendants architects' duties here undoubtedly was as they say, but that was by no means their only duty. Under these contracts and associated documents they had many other powers, authorities, responsibilities, and duties. Some of their rights and corelevant duties did relate to some of what the defendants architects possibly refer to as manners or means or techniques of construction of the contractor. But it would be a useless exercise in semantics and speculation to endeavor to examine or define or classify (which the architects here do not do) what is meant by manners or means or techniques of construction of the contractor and as to which ones the architects had duties and as to which ones they had no duties. Under these contracts and documents and under these facts and circumstances they had substantial relevant and applicable duties to persons in the position of these plaintiffs as we've set forth, whether those be considered to relate, in part, to what are possibly denominated to be manners or means or techniques of construction, or to something else.

■ Accordingly, the defendants architects were not entitled to directed verdicts or judgments notwithstanding the verdicts under the negligence counts of the complaint for any lack of duty to the plaintiffs. But, as in other alleged negligence type cases, there

114

could be no recovery against them unless it be established they were negligent and that their negligence was the proximate cause of the injuries sued for. And the architects argue as to that that there was no evidence the shores were inadequate, or that inadequacy of the shores was the proximate cause of the roof collapse, or that the plans were insufficient, or that there was negligence on the part of such defendants.

■■■■■■ The defendants architects' motions for directed verdicts and their post trial motion for judgment notwithstanding the verdict present the single narrow question whether there is in the record any evidence, together with all reasonable inferences to be drawn therefrom, which, standing alone and taken with all its intendments most favorable to the party (the plaintiffs) resisting the motions, tends to prove the material elements of his case, and which would justify submission of the case to the jury; on that inquiry we are not concerned with the weight or credibility of the evidence; reasonable inferences may be drawn from established facts, and all that can reasonably be required to establish controverted facts is that the evidence creates a greater or less probability, leading, on the whole, to a satisfactory conclusion; the inquiry here on this is whether the result reached in the trial court was one which is reasonable on the facts in evidence—not whether other conclusions might also have been reached; a verdict may not be set aside merely because the jury could have drawn different inferences; only where there is a complete absence of probative facts to support the conclusion drawn by the jury is it reversible error to overrule a motion for judgment notwithstanding the verdict; if there is an evidentiary basis for the jury's verdict they are free to disregard or disbelieve whatever facts are inconsistent with their conclusion; whenever facts are in

dispute or the evidence is such that fair minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is (the jury) to settle the dispute by choosing what seems to them to be the most reasonable inference; the focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury: Lindroth v. Walgreen Co., 407 Ill 121, 94 NE2d 847 (1950), and cases there cited.

Examined in the light of those principles, some of the evidence, together with reasonable inferences to be drawn therefrom, standing alone, and with its intendments most favorable to the plaintiffs, was this:

The architects prepared the relevant contracts, plans, specifications, drawings, and associated documents. These had to do, rather all inclusively, with all the orthodox features of the building work, including the structural parts. Under the relevant contracts the architects had rather extensive functions, powers, authorities, responsibilities, and duties. They were not only to prepare the plans, drawings, and specifications, but to have the general administration of the construction contracts and the supervision and direction of the work and they were to guard against defects and deficiencies in the work of the contractors. The particular immediate matter which was involved was not a simple, minor, unimportant, inconsequential, routine, nonvital, day to day detail. The removal of the north-south proscenium truss and the north and south columns and the temporary support, stay, or shoring of the west ends of each of the old four west-east trusses pending installation of the proposed new north-south main bearing truss were highly important, serious, vital steps in the whole construction process, to be done once and once only. The west ends of those old west-east trusses had to be temporarily supported and shored. The job could not be accom-

plished without doing so. And the nature of the particular immediate matter involved was such that it did not admit of any on the the job experimentation, trial and error, corrections, approximations, or mistakes. If one significant mistake or miscalculation occurred in the adequacy of the supports, stays, or shoring a collapse would inevitably occur. There could be no second opportunity to do something else. There could be no rectification. The supports, stays, columns or towers had to be correct—not about correct—and they had to be correct the first time. There would be no second time. The matter was inherently complex, delicate, and hazardous.

If the plans showed the total weight or load bearing at each end of the proposed new north-south main bearing truss upon the proposed completion of the new and remodelled building such was obscure and not readily apparent to other than unusually well trained eyes. The plans did not, in any event, specifically indicate the weight of the old roof and west-east trusses later to be temporarily supported by the supports, stays, columns, or towers concerned. Nor was the composition of the old roof given on the plans. What information was given as to roof composition, though otherwise intended by the architects, was evidently subject to some misconstruction by the contractor. Though there was some evidence the theoretical weight of the old roof and west-east trusses could be obtained from the plans, such, at best, would have been only after a complex series of involuted computations and deductions working backwards from the weight of the whole new and old roof on proposed completion of the remodelling, and there was evidence of a structural engineer that the weight of the old roof and west-east trusses could not be ascertained at all from the plans. If the west edge of each support, column or tower was set in 4 feet east of the west end of each

117

truss the center of the weight bearing load as to each truss on the column or tower thereunder would be 6½ feet east of the west end of each truss. The further in or east of the west end of each truss was the center of the weight bearing load the greater was the load on that column or tower. But the record is not clear as to the precise location of each column or tower or the precise center of the load as to each truss or whether all the columns or towers were set in exactly the same distance east of the west end of each truss. The 2 x 10's on top of each column of shoring were not connected together between the columns, nor was there any bottom bracing between the columns of shoring. Mr. Abbott of the architects' office was present at the time of location of the shoring. The architects did not stop the work. They did not condemn any of the work. There was no movement of the south column, to which the choker from the boom of the crane was attached, before the collapse of the roof. The shoring handbook of the manufacturer of the shoring said the maximum allowable shoring load was 5,000 pounds per leg, or 20,000 pounds per column or tower of shoring—no standard type scaffold could be safely loaded beyond 5,000 pounds per scaffold panel leg—adequate safety factors were included in the figures—and the recommended loading and capacity data must not be exceeded.

There was, Mr. DeWitt said, some overlap of the functions of an architectural engineer, which he is, and an architect, and a structural engineer, in the design of supporting structures. Why, in accordance with his illustration, an architect's supervisory functions would, he said, extend to seeing that an intended 8″ column of a certain weight and dimension was put in a building if the contractor was in the process of putting in a 6″ column of lesser weight, but would not extend to seeing that four west-east roof trusses

are adequately temporarily supported and shored when their prior supporting members were removed, he did not say. Before the collapse he and his office had made no calculations to determine whether the scaffolding, supports, or columns or towers used as shoring were strong enough to support the roof trusses and roof. No cross bracing of the shoring towers was assumed. There is no table in the brochure of the manufacturer of the shoring exactly like the situation here, as to what weight each leg would carry. Apparently he and his office had not examined the manufacturer's brochure during the erection and before the collapse. Though some of the concrete old roof had been cut back at the west edge, which would reduce the weight some, he did not know exactly how many feet of the roof had been cut back. He had not inspected the upper end of the shoring. He was in and about the job 3 or 4 times from about April 1 when the shoring was first erected until the collapse of May 3rd. Mr. Abbott of his office was more directly responsible for architectural supervision. Under his computations, as first made, the total theoretical dead weight load of the old roof and each west-east truss on each support, stay, scaffold, column, shoring or tower was 17,122 pounds ($\frac{1}{10}$th of 171,225 pounds, being 44.59 pounds per square foot—corrected from 43$\frac{1}{2}$—times 3,840 total square feet in the roof); correcting his computations for the heavier weight of each east-west truss, indicated in the Mississippi Valley drawings which he'd not at first noticed, i. e., adding the 2.15 pounds per square foot difference, his computations then were, apparently, 17,948 pounds theoretical load on each support ($\frac{1}{10}$th of 179,481 pounds, being 46.74 pounds per square foot times 3,840 total square feet)—a difference of 826 pounds more load per shore than his first figure of 17,122 pounds load; those were assuming the bearing point of each truss on the shore was at the

119

extreme west end of the truss; if the bearing point of each truss on the shore were, however, $6\frac{1}{2}$ feet east of the west end of the truss the load on each shore was increased and his computations on that basis were 19,200 pounds on each shore; if the difference of 826 pounds more load per shore resulting from his computations of the heavier weight of the east-west trusses indicated in the drawings be added to that 19,200 the theoretical load on each shore apparently, by his computations, was 20,026 pounds; he assumed a concrete roof $2\frac{1}{2}''$ thick—there is some evidence, including a piece of concrete, that it or some of it may have been $2\frac{3}{4}''$ thick—he said a difference of only $\frac{1}{4}''$ therein would mean about 3 pounds per square foot— if so, that could be 11,520 pounds more roof load over the whole 3,840 square foot roof, or 1,152 pounds ($\frac{1}{10}$th thereof) more load per each shore, which, if that were the case, would have made the theoretical load on each shore 21,178 pounds—20,026 plus 1,152—under his computations and some of the inferences therefrom.

Mr. Wurth, a structural engineer, said there was considerable overlap between architects and structural engineers; their standards of practice are the same as to design and specifications for changes in existing structural steel in buildings and remodelling; the weight to be shored where structural members of substantial size are to be removed should be given on the drawings; the plans here did not say what the existing roof construction was; from the plans he could not figure the dead load of the old roof; if the center of the weight bearing load were $6\frac{1}{2}$ feet east of the west end of each west-east truss the total weight on each shore would be about 23,700 pounds, and if 2,000 pounds were deducted for the part of the old roof removed there would be about 21,700 pounds on each shore; if the center of the load was $7\frac{1}{2}$ feet

east the load on each shore would be 24,500 pounds and deducting 2,000 pounds from that leaves 22,500 pounds dead load on each shore under those circumstances.

Mr. Fernandes said there was a reaction on each old east-west truss of about 24,700 pounds and the truss weight itself would be 3,000–4,000 pounds more at least; the computations would not give the exact weight of the old existing roof; some plans show the load of a truss at a given point, though in remodelling or shoring such is unlikely.

Mr. Sweetnam's computation of an 18,600 pounds dead load on each shore assumed the concrete roof to be 2½″ thick, assumed the center of the load to be 6½′ east of the west end of each truss, and assumed 3′ of the concrete roof had been removed. There was some evidence the concrete, or some of it, was 2¾″ thick, and even that slight variation could apparently make a large difference in the load. The record is not clear as to the precise location of the center of the load on each truss—whether 6½′ east or more from the west end of each truss—or that it was precisely the same as to each truss—and even a variation of a foot or a few inches could make a substantial increase in the load. And even Mr. DeWitt did not know how much of the concrete roof had been removed.

In addition to the theoretical dead weight load on each shore arrived at under the computations of any of the witnesses there would necessarily here under the circumstances have to also be taken into account and added thereto the live weight of any workmen on and about the roof and trusses.

The defendants architects' blue prints indicated that all the existing structure of the stage and west walls was to be removed—the existing (west-east) trusses were to remain and the end conditions were to be worked into the new (north-south) main bearing truss.

121

■ ■ The plaintiffs do not urge that the doctrine of res ipsa loquitur applies in this case, and there was expert testimony from expert, skilled, professional witnesses in the field of architecture, as particularly applied to the matter here involved, the structural features of the building, and hence it would appear Bollenbach v. Bloomenthal, 341 Ill 539, 173 NE 670 (1930), Olander v. Johnson, 258 Ill App 89 (1930), Paxton v. County of Alameda, 119 Cal App2d 393 (1953), and Hogmire v. Voita, 319 Ill App 644, 49 NE2d 811 (1943) (abstract decision) referred to by the defendants architects, are inapplicable or the requirements thereof have been satisfied. Mr. DeWitt is an architectural engineer. Mr. Wurth is a structural engineer. Mr. Fernandes is an architect. And Mr. Sweetnam is an architect and structural engineer. Under the applicable statutes an architect is exempt from the statutes regulating the practice of structural engineering, and a structural engineer is exempt from the statutes regulating the practice of architecture. As to the particular matter here involved we perceive no reason why they were not all competent to testify as expert witnesses. As with any expert witness the weight and credibility of their testimony is for the jury to determine upon a consideration of all the normally applicable factors, including a consideration of what the factual basis is for their respective opinions.

■ We believe, under the circumstances, that there was in the record evidence, together with all reasonable inferences to be drawn therefrom, which, standing alone and taken with all its intendments most favorable to the plaintiffs, tends to prove the material elements of their case and which justified submission to the jury. There was no complete absence of probative facts to support the conclusion drawn by the jury. Accordingly, there was no error

122

in denying the defendants architects' motions for directed verdicts and for judgments notwithstanding the verdicts under the negligence counts of the complaint.

With regard to the Structural Work Act counts of the complaint the defendants architects argue that they were entitled to directed verdicts and judgments notwithstanding the verdicts because the temporary shores erected to support the west ends of the old west-east trusses pending installation of the new north-south main bearing truss were not within the purview of the Act—they were not a temporary structure or piece of equipment designed or used to support workmen and their materials while they are incorporating them into a building—they were an integral part of the building itself, or a structure designed for form work, or to support a part of the building during construction; and there was no evidence the shores were inadequate, or that inadequacy of the shores was the proximate cause of the injuries, or that the architects were in charge of the work, since they had no right to control the manner in which the shores were constructed, or that the architects wilfully or knowingly violated the Act.

The Structural Work Act provides, so far as material, c 48, Ill Rev Stats 1963, pars 60, 69, in part, that:

"60. SCAFFOLDS, CRANES, LADDERS, etc. —ERECTION AND CONSTRUCTION.) Sec. 1. BE IT ENACTED BY THE PEOPLE OF THE STATE OF ILLINOIS, REPRESENTED IN THE GENERAL ASSEMBLY: That all scaffolds, hoists, cranes, stays, ladders, supports, or other mechanical contrivances, erected or constructed by any person, firm or corporation in this State for the use in the erection, repairing, alteration, removal or painting of any house, building,

123

bridge, viaduct, or other structure, shall be erected and constructed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon, or passing under or by the same, and in such manner as to prevent the falling of any material that may be used or deposited thereon. . . ."

. . . . . .

"69. PENALTIES—RECOVERY OF DAMAGES—ATTORNEY'S FEES.) Sec. 9. Any owner, contractor, sub-contractor, foreman or other person having charge of the erection, construction, repairing, alteration, removal or painting of any building, bridge, viaduct or other structure within the provisions of this act, shall comply with all the terms thereof, . . .

"For any injury to person or property, occasioned by any wilful violations of this act, or wilful failure to comply with any of its provisions, a right of action shall accrue to the party injured, for any direct damages sustained thereby; . . ."

 The Legislature intended the Act for the protection and safety of workmen in erecting and repairing of buildings; it has been construed liberally to accomplish that end; these temporary shores were not a permanent part of the building; they could be, and were intended to be, later removed without damage to the building after the new north-south main bearing truss was installed and the old west-east trusses were connected thereto; the Act relates to equipment used in the erection or repair of buildings and other structures; it deals with work that the Legislature has regarded as particularly hazardous, yet familiar and commonplace; the statute itself affords

124

the best means of its own exposition; a hoist or crane, the boom of which becomes disengaged and falls on and injures an employee, may be within the purview of the Act, for example, though the hoist or crane is not designed for or used as a means of climbing up and down, or standing on during performance of work, or on which to place materials while the materials are being incorporated into a building; the Act does not define safe, suitable, and proper manner, or proper and adequate protection—those questions must necessarily be left to the jury for determination as ones of fact; wilful violation of the Act or wilful failure to comply with its provisions are synonymous with knowing violation or knowing failure—it is not necessary that there should have been a reckless disregard of its provisions—a party may be liable thereunder not only when a dangerous condition, if in fact dangerous, is known to him, but also when by the exercise of reasonable care the existence of such dangerous condition, if in fact dangerous, could have been discovered and become known to him—notice of a condition is notice of a dangerous condition, if the condition is in fact dangerous; what is the proximate cause of an injury thereunder is ordinarily a question of fact for the jury—it only becomes a question of law when the facts are not only not disputed but are such that there can be no difference in the judgment of reasonable men on the inference to be drawn therefrom; there may be a disputed question of fact as to whether a particular party can be deemed to be a party having charge of the erection, construction, etc., within the meaning of the Act and, if so, it is the province of the jury to make that determination. See: Bounougias v. Republic Steel Corp., 277 F2d 726 (CA 7th, 1960); Kennerly v. Shell Oil Co., 13 Ill2d 431, 150 NE2d 134 (1958); Schultz v. Henry Ericksson Co., 264 Ill 156, 106 NE 236 (1914); Oldham

v. Kubinski, 37 Ill App2d 65, 185 NE2d 270 (1962); Gannon v. Chicago, M., St. P. & P. Ry. Co., 22 Ill2d 305, 175 NE2d 785 (1961); Skinner v. United States, 209 F Supp 424 (USDCED Ill 1962); Yankey v. Oscar Bohlin & Sons, Inc., 37 Ill App2d 457, 186 NE2d 57 (1962).

The New York cases referred to by the defendants architects on this—Haughey v. Thatcher, 89 App Div 375, Ericson v. Bradley Contracting Co., 150 NYS 169, Adelstein v. Roebling Const. Co., 95 Misc 125, and Broderick v. Cauldwell-Wingate Co., 301 NY 182— are distinguished in Bounougias v. Republic Steel Corp., supra. Legowski v. Moreland & Co., 195 Ill App 377 (1915), referred to by the architects, was an abstract decision—the plaintiff employee fell from uncovered floor joists across which he was walking in a building under construction by the defendant— the judgment was for the defendant and that was affirmed—and, inter alia, the court held the fall was not due to defects in any of the objects mentioned in the Structural Work Act and it had no application. In Thon v. Johnson, 30 Ill App2d 317, 174 NE2d 400 (1961), the only other Illinois case referred to on this by the architects, a workman had stood on a 2″ x 8″ board lying across a stairwell opening, which was on edge and was nailed at right angles to another 2″ x 8″ and was nailed to a garage wall, the board constituting part of an uncompleted cement form for a proposed concrete slab over the stairwell opening in the floor, the plywood bottom of which form had not been yet placed in—the nails pulled loose, the board gave way, and the plaintiff fell to the bottom of the stairwell—the court held the board which was a part of the uncompleted cement form was not a scaffold under the Act. There is no analogy between uncovered floor joists or a 2″ x 8″ board lying on edge as part of an uncompleted cement form and the shores for the

west ends of the old west-east roof trusses here concerned. That a particular item involved in the construction work may not be a "scaffold" within the customary definition of "scaffold" does not mean it may not be a hoist, crane, stay, ladder, support, or other mechanical contrivance, within the purview of the Act. The Act is not limited to what are customarily referred to as "scaffolds."

■ We think the temporary shores, columns, or towers of tubular steel scaffolding here erected or constructed temporarily to support the west ends of the old west-east roof trusses during construction pending installation of the new north-south main bearing truss were "supports"—and possibly were "stays" or "other mechanical contrivances"—erected or constructed for use in the erection or alteration of the building within the meaning of the Act, and hence were within the purview of the Act. They were not an integral permanent part of the building. They could be and were intended to be later removed without damage to the building. They were not structures designed for form work. That they may not here have been temporary structures here designed or here used to support workmen and their materials while they are incorporating them into the building—that they may not have been "scaffolds"—does not militate against their being "supports." They were intended to support temporarily a part of the building itself during construction. The statute itself affording the best means of its own exposition, they were, literally, "supports," and may have been, literally, "stays" or "other mechanical contrivances."

■ As to whether the shores were inadequate, or whether inadequacy of the shores was the proximate cause of the injuries, or whether the architects were in charge of the work, within the meaning of the Act, or whether they wilfully or knowingly, within

127

the meaning of the Act, violated the Act, it is not necessary again to review the evidence. There was evidence, together with all reasonable inferences to be drawn therefrom, which standing alone and taken with all its intendments most favorable to the plaintiffs, tends to prove the material elements of their case and which justified submission to the jury. There was no complete absence of probative facts to support the conclusion drawn by the jury. Hence there was no error in denying the defendants architects' motions for directed verdicts and for judgments notwithstanding the verdicts under the Structural Work Act counts of the complaint.

The defendants architects then say the court should have allowed the motion for new trial part of their post trial motion because of several alleged errors, these being, except for matters we've already commented on, as follows: the verdicts are against the manifest weight of the evidence; their motion for mistrial during the examination of the witness Ronald W. Shafer should have been allowed; error occurred in the cross-examination by the plaintiffs of the defendant Lyle V. DeWitt; plaintiffs' counsel used diagrams of his own preparation and these were permitted to go to the jury; plaintiffs changed their theory under the Structural Work Act; references in the plaintiffs' closing argument to the failure of Mr. Abbott and Mr. Bull to testify were erroneous; the court left to the jury the construction and application of the Structural Work Act, which was a question of law for the court; the court left to the jury the construction and interpretation of the architects' contract; the court erred in giving plaintiffs' instruction 11, and in refusing the defendants architects' instructions 4, 5, 6, 7, 8, 9, 10, and 12; plaintiffs erroneously defined "scaffold" in their closing argument;

the verdicts are excessive; and the court erred in dismissing the third-party complaint.

██ ██ A verdict may not be set aside merely because the evidence is conflicting; the court cannot usurp the functions of the jury by substituting its judgment for that of the jury in passing on the weight and credibility of conflicting testimony; if the verdict is not clearly against the preponderance of the evidence —if it is not clearly wrong—if an opposite conclusion is not clearly evident—the verdict is not against the manifest weight of the evidence and may not be set aside for that reason: City of Monticello v. LeCrone, 414 Ill 550, 111 NE2d 338 (1953) ; Cardona v. Toczydlowski, 35 Ill App2d 11, 180 NE2d 709 (1962). Without again reviewing the evidence, but considering it all together, the verdicts here were not clearly against the preponderance thereof, they are not clearly wrong, and an opposite conclusion is not clearly evident—hence the verdicts are not against the manifest weight of the evidence. The architects refer us to no authorities on this.

██ Ronald W. Shafer's testimony was extremely brief. Up to the time the first objection of the defendant School District was sustained it was innocuous. It was not being offered against the defendants architects. The first objection having been sustained, the further objection of the defendant School District having been also sustained after the comment of plaintiffs' counsel, the defendants architects not having objected, though they asked a mistrial, and a motion to strike all the witness' testimony having been granted, and the jury instructed to disregard the same—none of that testimony having been permitted to stand— there was no error in denying the defendants architects' motion for mistrial on that account. There is nothing to indicate that what little was said in that

129

stricken testimony could, under the circumstances—there being much other evidence—have had any important bearing with the jury.

There being no objection by the defendants architects to the line of questioning concerned of the defendant Lyle V. DeWitt on the plaintiffs' recross-examination, as abstracted, and there being practically no reference thereto in the plaintiffs' argument to the jury, as abstracted, the matter is not now available. No authorities are suggested as to this matter.

 The only reference in the abstract to which the defendants architects call attention as to a sketch or diagram of plaintiffs' counsel indicates that plaintiffs' Exhibit No. 46 was a sketch made by their counsel representing a profile through the south truss of the building looking north, and was used during the cross-examination of the defendant DeWitt by the plaintiffs under section 60 of the Civil Practice Act, and was received in evidence, over the objection of the defendants architects, but the jury was instructed it did not purport or represent to be accurate as to every detail but was used for illustration purposes only, and the witness testified as to several of what he deemed to be omissions or inaccuracies therein. Under the circumstances, though the specific preliminary foundation proof for admission of that exhibit left something to be desired, there was other evidence and facts and circumstances indicating it to be generally representative of part of the situation, and in view of the cautionary instruction and all the other evidence in this extensive record we do not believe its admission alone can reasonably be said to be reversible error.

The theory of the plaintiffs under the Structural Work Act as alleged in substance in the complaint was that the general contractor, under the direction and supervision of the architects, had undertaken to support the roof by tubular steel scaffolding—while the

130

plaintiffs were removing certain supporting beams the scaffolding gave way and collapsed, causing a portion of the roof the plaintiffs were working on to fall—and as a proximate result the plaintiffs were injured—the temporary supports of the roof trusses, in other words, failed. We cannot perceive that the interrogation of the plaintiffs, in part, as to the details of where, physically, they were standing or working, and why—which would appear to be relevant physical facts—was intended at all to suggest that the failure to erect some scaffold was in violation of the Act, or that the plaintiffs had changed their theory, the plaintiffs having never sought to amend their complaint stating their theory and having several times said in the course of the trial they were not changing their theory. Too much should not be read into such interrogation and the later references in the argument. No authorities are suggested on this point.

 Where the plaintiff makes a prima facie case, the failure then of the defendant to produce evidence (of the driver of his car who was the agent of the defendant's intestate) warrants the inference that the testimony would be unfavorable to him, and may be considered by the jury, and comment in argument on the failure to produce such testimony is proper: Beery v. Breed, 311 Ill App 469, 36 NE2d 591 (1941). So here, the failure, unexplained, of the defendants architects to produce Mr. Bull, their employee who actually prepared the plans, or Mr. Abbott, their employee who was their actual supervisor on the job and more frequently visited the site, both of whom evidently were still their employees, for such evidence as they could give—the architects' plans and supervision being two of the important factual matters in the cause—did warrant an unfavorable inference, which might be considered by the jury and given such reasonable weight as they deemed proper under the

circumstances, and comment in argument by the plaintiffs thereon was proper. That they may not have been present at the moment of the collapse does not remove the possibility, if not probability, that they had some knowledge of some relevant facts and circumstances immediately prior thereto and concerning the plans. There was, therefore, no error in the argument on this matter. The architects refer to no cases on this.

The defendants architects suggest no pages of the abstract to identify and point out what they refer to in their next claimed errors that the court left to the jury the construction and application of the Structural Work Act and the construction and interpretation of the architects' contract. Apparently those matters relate to some of the given or refused instructions, and may be considered in conjunction with the next claimed error relating to the instructions.

The plaintiffs' given instruction 11 was an instruction in abbreviated form on the substance of paragraphs 60 and 69 of the Structural Work Act. An instruction in the applicable language or substance of the applicable language of a statute, if accurate, is normal and orthodox. It left no question of law to determination of the jury as to whether the particular device in question did or did not come within the legal meaning of the Act. By giving the instruction the court necessarily determined the question of law— that this general type of device did theoretically come within one of the general types of things referred to in the statute and instruction but the jury had to determine the facts as to whether factually the device was or was not in one of those categories. The only types of things or devices referred to in paragraph 60 which are not referred to in the instruction are "hoists" and "cranes," which are not at all here concerned. Even if "other mechanical contrivances"

132

were limited to devices of a similar character to scaffolds, hoists, cranes, stays, ladders, or supports, as the architects urge, the omission of specific reference to "hoists" and "cranes" in the instruction was not significant so far as this case and these devices are concerned. The word "wilful" in the instruction modifies "violation of this act" and "failure to comply with any of its provisions," and the omission of the repetition of "wilful" before "failure" does not change the substance of anything. "Direction" damages in the instruction appears to be merely a typographical error for "direct" and could not have really mislead the jury. The last sentence of the instruction "A violation of the statute exists where it is known to exist or where by the exercise of reasonable care it would have been discovered" is but an abbreviated statement of the long settled interpretation of "wilful violations" or "wilful failure to comply" as used in the Act.

The defendants architects' refused instruction 4 contained dictionary definitions of "scaffold" and "shore" and stated the temporary structure here concerned was a shore or shoring and not a scaffold. It was abstract in form, inappropriate, unnecessary, and inapposite, would not have been helpful to the jury, and might have been misleading and confusing.

The defendants architects' refused instructions 5, 6, 7, 8, and 9 are various statements of their theory as to the duties or lack of duties of the architects, and under these contracts and documents and under these facts and circumstances as to the architects' authority, powers, responsibilities, and duties the instructions would not have been correct as to the law.

The defendants architects' refused instruction 10 would not have been correct as to the law in its all inclusive definition of a scaffold, support, or

other mechanical contrivance under the Structural Work Act.

The defendants architects' refused instruction 12 would not have been correct as to the law in its limitation that evidence presented by architects as expert witnesses was the only way the jury may determine whether these defendants possessed and applied the knowledge and used the skill and care the law required. The cases referred to, which we've previously commented on, are inapplicable or the requirements thereof have been satisfied here. There was here expert testimony from expert witnesses in the field of architecture, as particularly applied to the matter here involved, the structural features of the building. An architectural engineer, a structural engineer, an architect, and an architect and structural engineer all testified. Court's instruction 1 (plaintiffs' instruction 14) which was given, is substantially the same as defendants' refused instruction 12, but omitting the principal objectionable part thereof.

Instructions are to be considered as a series and so considered, particularly with plaintiffs' 7, 10, 14, and defendants architects' 3, and 11, the giving of the one plaintiffs' instruction complained of and the refusal to give the several defendants' instructions complained of was not error. The defendants made no other tenders of any modified or alternative proposed instructions.

The particular reference to which the defendants architects call attention in the argument of plaintiffs' counsel as being an allegedly erroneous definition of "scaffold" indicates the architects interrupted and objected to an incompleted statement of counsel, which evidently never was finished. It cannot be conjectured what the whole phrase or sentence was going to be had counsel been permitted to

134

complete it. Not all the arguments are abstracted—only certain excerpts therefrom—but from what can be seen, considered in the context in which given, it does not seem there was any reversible error on this score. No cases are suggested as to this.

 As to the alleged excessiveness of the verdicts, the principal argument of the defendants architects is that they could only have been the result of prejudicial and inflammatory conduct of plaintiffs' counsel in building a resentment by showing the architects' fees and conveying the inference they did nothing to earn such fee. We are referred to no authorities on the point. The only abstract reference given indicates an allusion by plaintiffs' counsel to the circumstances that part of the architects' compensation was for supervision—which is in accord with the evidence—but the abstract does not indicate any objection thereto by the architects during the course of the argument. The matter is not available, under the circumstances, to the architects to now complain of on that basis. Nothing else has been pointed out to indicate the amounts were due to prejudice or passion.

As to the claimed error in dismissing the third party complaint, section 25(2) of the Civil Practice Act, c 110, Ill Rev Stats 1963, par 25, provides, so far as relevant, that:

> "(2) Within the time for filing his answer or thereafter by leave of court, a defendant may by third-party complaint bring in as a defendant a person not a party to the action who is or may be liable to him for all or part of the plaintiff's claim against him. . . . Nothing herein applies to liability insurers or creates any substantive right to contribution among tortfeasors or against any insurer or other person which has not heretofore existed."

The defendants architects argue that by that statute it was not intended that the court, on motion preceding trial, would determine as a matter of law that the third party would not be liable over to the defendant-third-party plaintiff and dismiss the third-party complaint; it is sufficient if the third party may be liable to him; the third-party complaint need not show with certainty a right to recovery over; the decision must await the receipt of evidence; no one can say with any degree of certainty that the verdicts would have been the same had the proposed third-party defendant been a party; the purpose of third-party practice is to permit determination of the rights and liabilities of all parties connected with an accident in one trial; such practice is proper where liability is asserted under the Structural Work Act; there is a right of indemnity in favor of one whose negligence is passive against one whose negligence is active—the active negligence here was of Fisher-Stoune, Inc., the general contractor—if there was any negligence of the defendants architects it was of a passive character; in determining whether a third-party complaint should be dismissed before trial the record must be taken as it exists at the time the motion to dismiss is made and the order of dismissal is entered; the allegations of the plaintiffs' complaint do not charge the defendants architects with active negligence. The third-party complaint is not based on any alleged express indemnity agreement but on an alleged implied indemnity liability.

In addition to section 25(2), a third-party complaint, like any complaint, is governed by the same procedural requirements of the Civil Practice Act which apply to other complaints or pleadings, so far as applicable, including those to the effect that the Act does not affect in any way the substantial averments of fact necessary to state any cause of action

136

either at law or in equity—the pleading shall contain a plain and concise statement of the pleader's cause of action—demands for relief which the allegations of the pleading do not sustain may be objected to on motion—all defects therein, either in form or substance, not objected to in the trial court are waived—and all objections thereto shall be raised by motion: sections 31, 33, 34, 42, 45, Civil Practice Act.

The substance of the allegations of the complaint, answer of the defendants architects, amended third-party complaint by the defendants architects, and motion to dismiss the same of Fisher-Stoune, Inc., have been heretofore set forth and need not be repeated, but must be referred to in considering this matter.

The complaint alleged, in part (paragraph 9, Counts I, II, III) that the collapse of the roof and the injuries were the direct and proximate result of one or more of the following negligent acts or omissions of the defendants architects:

"(a) Negligently and carelessly failed to provide for adequate support for the roof of said gymnasium prior to having the structural supports therefor removed;

(b) Negligently and carelessly failed to calculate a sufficient safety factor to be used in the scaffolding under said roof;

(c) Negligently and carelessly failed to oversee and inspect the scaffolding as used to determine whether or not it was safe to use;

(d) Otherwise negligently and carelessly failed to apply to the work aforesaid the degree of skill which would customarily be brought to such work by competent architects in and about this community."

And the complaint further alleged, in part, (paragraph 9, Counts IV, V, VI) that the defendants violated c 48,

137

Ill Rev Stats 1959, § 60, which was a direct and proximate cause of the collapse of the roof and injuries, and that (paragraph 10, Counts IV, V, VI) by c 48, Ill Rev Stats 1959, § 69, a cause of action had accrued to the plaintiffs for damages.

The defendants architects did not question the legal sufficiency of the complaint by motion to dismiss or strike, but filed an answer.

The amended third-party complaint alleged, in part, that if any liability is imposed on the third-party plaintiffs under Counts I, II, and III, their negligence is passive, the active negligence being solely that of Fisher-Stoune, Inc., and if any liability is imposed on the third-party plaintiffs by Counts IV, V, and VI, it is a liability imposed by law without fault on their part, the person having actual charge of the work being Fisher-Stoune, Inc., and further alleged, in part, (paragraph 12) that the third-party defendant was guilty of one or more of the following acts of negligence which proximately caused the injuries and damages:

"(a) Negligently and carelessly failed to provide for adequate support for the roof of said gymnasium prior to having the structural supports therefor removed.

(b) Negligently and carelessly failed to calculate a sufficient safety factor to be used in the scaffolding under said roof, during the removal of the permanent supports therefrom.

(c) Negligently and carelessly failed to oversee and inspect the temporary supports so used to determine whether or not the same were safe to use.

(d) Negligently and carelessly failed to apply to the work the degree of skill which would customarily be brought to such work by a competent contractor in and about said community.

(e) Negligently and carelessly failed to erect and construct the temporary supports in a safe, suitable and proper manner so as to give proper and adequate protection to the life of any person or persons employed or engaged thereon or passing under or by the same, in violation of Paragraph 60, Chapter 48 Illinois Revised Statutes.

(f) Wilfully violated the provisions of Paragraph 69, Chapter 48 Illinois Revised Statutes.

(g) Negligently and carelessly disconnected the permanent supporting beams or columns from said roof.

(h) Negligently and carelessly disconnected the permanent supporting beams or columns without first having placed thereunder a proper and adequate temporary support.

(i) Negligently and carelessly attached to the permanent supporting beams or columns a cable connected to a crane in such a manner as to not adequately hold said supporting beam in place when the bolts or rivets were removed therefrom.

(j) Negligently and carelessly operated the crane while the cable therefrom was attached to the permanent supporting column or beam in such a manner as to cause therein a sudden movement, thus precipitating the collapse of said roof.

(k) Negligently and carelessly designed and constructed the temporary supports, using therein material of insufficient strength or design to support the roof of the gymnasium when the permanent supporting structures were removed.

(l) Negligently and carelessly removed the permanent supports for said roof."

139

■ The motion to dismiss the third-party complaint admitted for the purpose of the motion only the well pleaded allegations of fact therein, not any allegations of conclusions or matters of law, and there were a number of allegations of conclusions or matters of law therein.

It will be observed that paragraph 12(a) of the third-party complaint by the defendants architects is identical to paragraph 9(a) of Counts I, II, and III of the complaint against the defendants architects; paragraphs 12(b)(c) and (d) of the third-party complaint are in substance the same as paragraph 9(b)(c) and (d) of Counts I, II, and III of the complaint (changing "competent architects" to "competent contractor" in (d)); paragraphs 12(e) and (f) of the third-party complaint are in substance the same as paragraph 9 of Counts IV, V, and VI of the complaint; and paragraph 12(k) of the third-party complaint is, in part, the same in substance as parts of paragraph 9(a)(b)(c) and (d) of Counts I, II, and III of the complaint.

■ Generally, one joint tort-feasor may not recover indemnity as against the other tort-feasor for injury caused by such other where the party seeking indemnity is in pari delicto, but one not joining in the wrongful act may recover, and a joint tort-feasor who is only technically negligent may recover against the other tort-feasor who was actually negligent: 21 Ill L and P, p 321. Where one does the act which produces the injury and the other does not join in the act but is thereby exposed to liability and suffers damage the latter may recover against the principal delinquent: Cf. John Griffiths & Son Co. v. National Fireproofing Co., 310 Ill 331, 141 NE 739 (1923). Implied indemnity relates to cases where the party seeking indemnity is guilty of only passive, technical negligence and the active, primary negligence is that of

140

the person against whom indemnity is sought—where the party seeking indemnity has been made liable by act of the person against whom indemnity is sought for failing to discharge a responsibility even though the party seeking indemnity is not guilty of any active negligence: Gulf, M. & O. R. Co. v. Arthur Dixon Transfer Co., 343 Ill App 148, 98 NE2d 783 (1951). Secondary as distinguished from primary liability rests upon a fault that is imputed or constructive only, being based on some legal relation between the parties, or some positive rule of common or statutory law, or because of a failure to discover or correct a defect or remedy a dangerous condition caused by the act of one primarily responsible: Fidelity & Casualty Co. of N. Y. v. J. A. Jones Const. Co., 325 F2d 605 (1963).

██ Section 25(2) of the Civil Practice Act does not change those principles—it does not create any substantive right to contribution among tort-feasors which has not heretofore existed.

██ Under the Structural Work Act if a device is within the terms of the Act it must be erected and constructed in a safe, suitable, and proper manner, etc.—any owner, contractor, sub-contractor, foreman, or other person having charge of the erection, construction, etc., of any building, etc., shall comply with all the terms thereof—and for any injury to person, etc., occasioned by any wilful violation of the Act or wilful failure to comply with its provisions a right of action accrues to the party injured for any direct damages sustained thereby. Under the circumstances indicated it imposes a duty upon each of the parties therein named—the owner, contractor, sub-contractor, foreman, or other person—if the party has charge of the erection, construction, etc. The duty of each such party, if so "having charge," is independent of the duty of the other. No such party can escape his

statutory liability by pointing to the others' breach of duty. If any injury is caused by a particular one of such party's wilful violation of the Act or wilful failure to comply with its provisions (within the meaning of "wilful" as used in the Act and as has been defined in the cases)—and there can be no liability thereunder except for a wilful, knowing act or failure to act—that particular party is liable regardless of the possible fault or liability of any others of the parties therein named: Kennerly v. Shell Oil Co., 13 Ill2d 431, 150 NE2d 134 (1958); Gannon v. Chicago, M., St. P. & P. Ry. Co., 22 Ill2d 305, 175 NE2d 785 (1961); Yankey v. Oscar Bohlin & Son, Inc., 37 Ill App2d 457, 186 NE2d 57 (1962).

If the allegations *by* the defendants architects in their third-party complaint against Fisher-Stoune, Inc., constitute allegations of active negligence (paragraph 12(a)(b)(c)(d)(k)), as they say they do, and as we think they do, the identical or substantially similar allegations *against* the defendants architects in the complaint (paragraph 9, (a)(b)(c)(d), Counts I, II, III) also constitute allegations of active negligence. The same or substantially the same allegations of negligence in paragraph 12(a)(b)(c)(d)(k) of the third-party complaint and paragraph 9(a)(b)(c)(d) of the complaint cannot be allegations of active negligence in the third-party complaint *by* the architects and not similarly be allegations of active negligence in the complaint *against* the architects.

■ The complaint against the defendents architects was in six counts—alleged common law negligence (Counts I, II, III), and alleged violation of the Structural Work Act (Counts IV, V, VI); under either theory, under the state of the allegations of the complaint and third-party complaint, the defendants architects would be liable, if liable at all, as active tort-feasors, and as such not entitled to recover over

142

from a possible joint tort-feasor; liability under the Structural Work Act extends to those in charge of construction who make wilful violations of the Act, wilful violations being knowing violations; the common law negligence counts were based on the defendants architects allegedly actively failing to provide for adequate support for the roof, failing to calculate a sufficient safety factor to be used in the scaffolding, failing to oversee and inspect the scaffolding to determine whether or not it was safe to use, and otherwise failing to apply the degree of skill customarily brought to such work by competent architects in and about the community; if they were liable at all it would be only as active tort-feasors and the law precludes indemnification between active tort-feasors; if they were not liable there would be no need for indemnification: Yankey v. Oscar Bohlin & Son, Inc., 37 Ill App2d 457, 186 NE2d 57 (1962). And see: Bohannon v. Joseph T. Ryerson & Son, Inc., 16 Ill App2d 402, 148 NE2d 602 (1958). As of the time of the motion to dismiss the third-party complaint here, it appeared that if the plaintiffs were able to prove the allegations of the complaint the defendants architects would be active tort-feasors and not entitled to indemnity, but if as alleged, in substance, in their answer and third-party complaint they were free from negligence and any wilful violation of the Structural Work Act and the incidents occurred as the result of the alleged acts of Fisher-Stoune, Inc., then the plaintiffs would be unable to recover damages from them; in either event they would not be entitled to indemnity; the third-party complaint discloses, rather, sole alleged liability of the proposed third-party defendant to the plaintiffs for the incidents and resulting injuries, instead of an alleged liability of the proposed third-party defendant to the defendants architects for indemnification for all or

143

part of the plaintiffs' claims against the architects—in effect, it attempts to eliminate the original defendants architects and substitute the proposed third-party defendant general contractor as a defendant: Shulman v. Chrysler Corp., 31 Ill App2d 168, 175 NE 2d 590 (1961). As of the time of the motion to dismiss the third-party complaint the effect of the allegations of the complaint and the third-party complaint was that the defendants architects and the proposed third-party defendant general contractor were both allegedly guilty of violation of duties they had for the safety of the employees at the site and that such alleged breaches of duty upon the part of each was an alleged proximate cause of the alleged injuries and damages—and when parties have allegedly violated similar duties to an injured person neither is entitled to indemnity from the other. Cf. Fidelity & Casualty Co. of N. Y. v. J. A. Jones Const. Co., 325 F2d 605 (1963)—where the court affirmed a judgment dismissing an indemnity complaint against the general contractor of the liability insurers of the architects who had paid judgments obtained against the architects by representatives of certain employees of the general contractor—which case and its predecessor, Erhart v. Hummonds, 334 SW2d 869 (Sup Ct Ark 1960), we've heretofore referred to, and which cases are rather closely analogous to the present case. And, as to the Structural Work Act it has been said that it would be fatal to any recovery in an indemnification action by an owner against a general contractor if the owner was "in charge of" or came within "having charge of" the erection, etc., within the meaning of the Act: Cf. Shell Oil Co. v. Poster-Wheeler Corp., 209 F Supp 931 (1962)—and that question, inter alia, was already in issue in effect in the case at bar under the complaint and the defendants architects' answer and was one of the matters the

144

jury had to decide—if the plaintiffs, inter alia, did not establish that the architects under these circumstances did have charge of the erection, etc., they could not recover under that Act—if they did so establish then under Shell Oil Co. that would be fatal to an indemnification action by the architects against the general contractor. There was no inhibition on the defendants architects in fully litigating that issue.

Representative of the cases referred to by the defendants architects are: Moroni v. Intrusion-Prepakt, Inc., 24 Ill App2d 534, 165 NE2d 346 (1960); Blaszak v. Union Tank Car Co., 37 Ill App2d 12, 184 NE2d 808 (1962); Rovekamp v. Central Const. Co., 45 Ill App2d 441, 195 NE2d 756 (1964); and D'Amico v. Moriarty Meat Co., 47 Ill App2d 63, 197 NE2d 445 (1964). Without here attempting a detailed analysis of each, they have all been given consideration; we do not think they militate against our views; they indicate no different principles of law; each involves an application in various ways of some of these principles to a particular, given set of facts, which facts in most instances are not too analogous to the present alleged state of facts; and these further general observations may be made: In Moroni the complaint was entirely under the Structural Work Act—there were no allegations of common law negligence—the defendant third-party plaintiff was the owner of the property and was not alleged to have had any connection with the scaffold erected by the general contractor Intrusion except the owner's status as owner —it arose after Kennerly v. Shell Oil Co., 13 Ill2d 431, 150 NE2d 134 (1958) when the law was considered to impose liability under the Act on an owner by reason of his status as such, regardless of whether he was one "having charge of" the erection, etc., or not, and it arose before Gannon v. Chicago, M., St. P. & P. Ry. Co., 22 Ill2d 305, 175 NE2d 785 (1961)

when the law was considered modified to impose liability thereunder only on such owners or other named persons as have charge of the erection, etc.—and the court had no occasion to consider whether that circumstance had any significance. In Blaszak the complaint was entirely on common law negligence—there were no allegations under the Structural Work Act, the facts were not at all similar to those here—there was principally involved a written "Car Service Agreement" between Union Tank Car Company and Shell Oil Company relating to tank car leasing by Union to Shell under which Shell, the lessee, assumed some responsibility to Union, the defendant third-party plaintiff, and some implied indemnification responsibility for the clean condition of the cars—and it is not at variance with the later and more factually applicable case of Yankey v. Oscar Bohlin & Son, Inc., 37 Ill App2d 457, 186 NE2d 57 (1962), the same judge delivering the opinions in both cases. In Rovekamp although the complaint (by an employee of a subcontractor against the general contractor) ostensibly alleged a common law negligence cause of action that was an incidental result and not the purpose of the complaint, its obvious purpose being to state an alleged cause of action only under the Structural Work Act—the third-party complaint was directed only to stating a cause under the Structural Work Act—the defendant third-party plaintiff was the general contractor and its complaint was against the subcontractor roofer—the allegations of the complaint and third-party complaint are referred to only briefly, but the court said the general contractor was exposed to liability only because of its "technical violation" of the Act whereas the subcontractor roofer "was the primary tort-feasor wholly responsible for William Rovekamp's injuries," language hardly applicable to the present alleged state of facts and present status

146

of the pleadings here—and apparently Yankey v. Oscar Bohlin & Son, Inc. in the same district was not called to the court's attention. In D'Amico the complaint was entirely on alleged common law negligence —there were no allegations under the Structural Work Act—the facts were not at all like those here—the court referred to some of the well accepted principles in the general field and did not disagree with Shulman v. Chrysler Corp., 31 Ill App2d 168, 175 NE2d 590 (1961) but felt it did not apply in D'Amico.

 Under the allegations of the complaint, answer, and third-party complaint the defendants architects were allegedly in pari delicto; they were not in the position of a party not joining in an alleged wrongful act; they were not just technically negligent; they were not vicariously exposed to liability and damage by the sole act of someone else—the general contractor; they were not allegedly guilty of only passive, technical negligence; the alleged fault against them is not of an imputed or constructive character only.

Hence, the proposed third-party defendant general contractor, Fisher-Stoune, Inc., was not a person who is or may be liable to the defendants architects for all or part of the plaintiffs' claims against the defendants architects, within the meaning of section 25 (2) of the Civil Practice Act, and there was no error in sustaining the motion to dismiss the third-party complaint and in dismissing the same.

With regard to the plaintiffs' cross appeal from the judgment or judgments entered on the verdict or verdicts for the defendant School District owner that defendant was by the complaint charged only in Counts IV, V and VI with an alleged violation of the Structural Work Act. It would be liable thereunder only if, inter alia, the plaintiffs established that it was an owner "having charge of the erection, con-

struction," etc., of the building within the meaning of the Act. There was, inter alia, a disputed question of fact as to whether it could be deemed to be such an owner so having charge of the erection, construction, etc., under the Act, and it was within the province of the jury to make that determination. Without again reviewing the evidence, but considering it all together, the verdict or verdicts for it were not clearly against the preponderance of the evidence, they were not clearly wrong, and an opposite conclusion is not clearly evident—hence that verdict or those verdicts are not against the manifest weight of the evidence. Cf. City of Monticello v. LeCrone, 414 Ill 550, 111 NE2d 338 (1953); Cardona v. Toczydlowski, 35 Ill App2d 11, 180 NE2d 709 (1962).

The judgments will, therefore, be affirmed.

Affirmed.